In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2592

TRENT MARION,

*Plaintiff-Appellant,*

*v.*

THE CITY OF CORYDON, INDIANA and JOHN DOE #1,
Unknown Police Officers of the City of Corydon,
THE COUNTY OF HARRISON, INDIANA and JOHN DOE #2,
Unknown Police Officers of the County of Harrison,
ROY WISEMAN, BRUCE LAHUE, KEVIN TAYLOR, JAMES
SADLER, TODD STINSON, THE CITY OF LOUISVILLE,
KENTUCKY and JOHN DOE #3, Unknown Police Officers
of the Louisville Metropolitan Police Department,
THE CITY OF NEW ALBANY, INDIANA and JOHN DOE #4,
Unknown Police Officers of the City of New Albany,
JOHN DOE #5, Unknown Police Officers of the
Indiana State Police,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. 4:07-cv-0003-DFH-WGH—**David F. Hamilton**, *Chief Judge.*

ARGUED FEBRUARY 19, 2009—DECIDED MARCH 23, 2009

Before FLAUM and WILLIAMS, *Circuit Judges*, and KAPALA, *District Judge*.[1]

FLAUM, *Circuit Judge*.   Plaintiff Trent Marion brought this action under 42 U.S.C. § 1983 against the City of Louisville, the City of Corydon, the City of New Albany, the County of Harrison, and several officers from those jurisdictions and from the Indiana State Police. He alleged that the law enforcement officers and government entities violated his Fourth Amendment rights by using excessive force against him in connection with a police pursuit and subsequent shooting. All defendants, except the City of Louisville and its unknown officers, filed motions for summary judgment. Defendants supported their motions with affidavits and with video and audio recordings. Marion offered no counter-affidavit and pointed to no evidence that would call into question defendants' submissions. Finding no triable issue of fact, the district court granted summary judgment for all named defendants. Marion appealed, and we now affirm the district court's grant of summary judgment.

## I. Background

### A. Facts

The facts presented here are taken from the affidavits of law enforcement officers and other witnesses to the police chase, as well as from video and audio evidence of the chase.

---

[1]  Of the Northern District of Illinois, sitting by designation.

On January 20, 2006, police officers approached Marion on suspicion of shoplifting as he was leaving a Kroger grocery in Louisville, Kentucky. When approached, Marion admitted that he had hidden grocery items in and around a baby in an infant seat that Marion had placed in the grocery cart he was pushing. As officers escorted Marion to the store's loss prevention office, he grabbed the infant seat, pushed one officer aside, and bolted out of the store.

The police officers and store personnel followed Marion outside to the parking lot, where Marion ran to a red 1993 Ford Explorer. After tossing the baby seat, with the baby in it, into the front seat on the passenger side, Marion attempted to enter and start the vehicle. A scuffle ensued between Marion and the Louisville police officers on the scene. During the scuffle, a Kroger employee managed to grab the baby seat and remove the baby from the vehicle.

Louisville Police Officer Michael Alvey attempted to use his taser to subdue Marion, but Marion reached out and twisted the taser cartridge so that it would not fire. He backed his vehicle out of the parking space with a door open, collided with another vehicle, and fled. As Marion fled the parking lot, Alvey pursued immediately in his police car. Marion led Alvey and other Louisville police units on a high speed chase through the streets of Louisville to Interstate 64.

Marion continued on I-64 into Indiana. As he entered Indiana, Louisville dispatchers alerted law enforcement agencies in Indiana to the chase. New Albany, Indiana

Police Captain Rick Denny received a radio dispatch alert that Louisville police were pursuing an armed robbery suspect westbound on I-64. Denny pulled into a turn-around area in the median near mile marker 120. Almost immediately, he observed Marion in his Ford Explorer traveling west in excess of 80 miles per hour. He observed several Louisville police cars in pursuit with emergency lights and sirens activated. Denny joined the chase. Because he was the first Indiana officer to join, Denny eventually took over the lead car position in the pursuit. Other officers from Corydon and Harrison County joined in the pursuit, and the Louisville officers dropped back. The video taken with a camera mounted on the dashboard of Denny's police cruiser shows Marion's reckless driving at high speed. As the miles ticked by, Marion's vehicle started to emit smoke.

At approximately mile marker 113, a Harrison County Sheriff's deputy in the highway median deployed "stop sticks" in an effort to deflate the tires on Marion's Explorer. Marion swerved to try to avoid them. The stop sticks damaged and deflated three tires, but Marion continued to drive. He slowed from approximately 80 miles per hour to about 40 miles per hour and swerved from one side of the highway to the other, eventually returning to the left lane. Debris from the shredding tires and from the Explorer began falling in the path of the pursuing police units. Different police cars pulled to the side of Marion to observe him and, in at least one instance, to signal him to pull over. The police maneuvered to block Marion from taking any exit he passed.

As the pursuit approached mile marker 105 and the Corydon exit, officers attempted to deflate the one rear tire that had survived the first set of stop sticks. Several law enforcement vehicles were parked in the median with officers outside their cars, weapons drawn and stop sticks deployed. As Marion approached the stop sticks, he swerved and drove toward several of the officers in the median area and then back into the left lane, avoiding the stop sticks. Soon thereafter, Louisville police officers pulled completely out of the chase and headed back to Kentucky.

Denny, who still was the lead pursuing officer, then coordinated over the radio a rolling roadblock on Marion. One police vehicle pulled ahead of Marion (driven by Officer James Sadler) and another pulled alongside him in the other lane (driven by Captain Brad Shepard) in an attempt to "box in" the Explorer and gradually force it off the road. For a minute or so, Marion attempted numerous maneuvers to avoid the rolling roadblock. He tried to pass between the police vehicles and swung his Explorer back toward Denny, making some contact. Eventually, he tried to pull around Sadler on the shoulder to Sadler's left. Sadler stuck his rifle out the driver's window of his vehicle and fired four shots at Marion's vehicle in a further effort to disable it.

Near mile marker 103, Marion slowed and then suddenly turned hard to the left into the grass median toward the eastbound lanes of the interstate, where traffic was slowing or stopped. The highway median was wet and

muddy, but Marion continued to drive his Explorer toward the eastbound lanes. The Explorer slowed as he tried to cross. Officers moved on foot to surround the Explorer, and they fired their initial shots at Marion. Just as the muddy median and initial shots seemed to be bringing Marion's vehicle to a halt, he put the Explorer into reverse and revved the engine, causing the tires to spray mud, and the Explorer moved back several feet. This maneuver scattered the officers who were approaching the Explorer from the rear. Officer Kevin Taylor, a Harrison County Sheriff's Deputy, was behind the Explorer. He and other officers yelled for Marion to stop. When Marion did not stop, Taylor fired six rounds at the Explorer as it backed toward him. As more officers approached and demanded that Marion stop and raise his hands, Marion shifted back into a forward gear and continued revving the engine to move forward. Lieutenant Roy Wiseman of the Harrison County Sheriff's Department and other officers were positioned directly in front of the Explorer. They began firing at it when it moved toward them and toward the eastbound lanes of the interstate.

All affidavits from officers who fired their weapons when Marion was in the median testified that they did so in fear of lethal danger to themselves or to others. All testified that at no point did they see any sign that Marion was trying to surrender or was stopping his attempts to flee. All of the officer and civilian affidavits indicated that it appeared that Marion intended to drive his vehicle through the median and into the eastbound lanes of the highway.

After Marion stopped revving the engine and the shooting stopped, he was pulled from the vehicle and given medical attention. He had suffered significant gunshot wounds. As a result of his wounds, Marion lost his right eyeball, resulting in permanent vision loss on the right side, and he suffered severe damage to his left hand. The officers discovered that Marion was not actually armed. The law enforcement officers who submitted affidavits have all stated that they believed Marion was armed, based on radio transmissions and, in some instances, from the manner in which he was reaching around in his vehicle while driving, as though attempting to locate a firearm.

### B. District Court Proceedings

Marion filed suit under § 1983 on January 5, 2007. He claimed that defendants violated his Fourth Amendment rights and that the officials were not entitled to qualified immunity. He sued for $21.5 million in total damages, including requests for compensatory and punitive damages. On May 11, 2007, the district court entered a case management plan which set out certain deadlines, including discovery and dispositive motions. On November 14, 2007, the City of New Albany filed its motion for summary judgment. The City of Corydon, the County of Harrison, Roy Wiseman, Bruce Lahue, Kevin Taylor, James Sadler, and Todd Stinson followed with similar motions. Marion opposed all motions for summary judgment, yet he did not file or otherwise rely upon an affidavit or sworn testimony of his own to oppose any of the pending motions.

On March 20, 2008, the district court granted defendants' motions for summary judgment. The court concluded that defendants' evidence showed it was reasonable for the officers to fire their weapons at Marion after he had endangered the officers and innocent civilians over the course of a long high-speed chase; after less drastic measures had repeatedly failed to stop Marion's attempt to flee; and as Marion was revving his engine, moving the Explorer, and trying to gain traction in the median to continue his flight. The court noted the arguments of plaintiff's counsel could not substitute for evidence, and without contradictory evidence, there were not triable issues of fact. The court ordered Marion to show cause why it should not grant summary judgment in favor of all other defendants.

On April 16, 2008, Marion filed a motion to reconsider summary judgment. He included new evidence in the form of his own belated affidavit. In the affidavit, Marion stated that he turned his vehicle into the median in an attempt to surrender. At the time, he said, his vehicle was overheating, had three flat tires, and was stuck in the mud. He claimed that while he was trying to surrender, the pursuing officers shot at him without warning.

On June 3, 2008, the district court denied Marion's motion to reconsider summary judgment. The court concluded that Marion's belated testimony was not properly before the court, and thus it could not consider the testimony. The court entered summary judgment in favor of any and all named defendants.

## II. Analysis

Marion appealed from the district court's grant of summary judgment. Our review is de novo, and we construe all facts and reasonable inferences in favor of the nonmoving party. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006).

As a preliminary matter, Marion does not properly argue on appeal that we should consider his affidavit that he submitted as part of his motion to reconsider the grants of summary judgment, and we conclude that we cannot consider his affidavit. It is well-established that we can only consider such an affidavit if it consists of newly discovered evidence that the party could not have introduced during the pendency of the summary judgment motion. *Feliberty v. Kemper Corp.*, 98 F.3d 274, 279 n.1 (7th Cir. 1996); *Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985). The evidence that Marion submitted cannot be construed as newly discovered evidence; the affidavit simply consists of his version of the events at issue.

Marion argues that the officers that shot him used potentially deadly excessive force in violation of his Fourth Amendment rights. He continues that use of such force was unreasonable and unconstitutional under the circumstances, and that disputed factual issues bar summary judgment in this matter. Defendants respond that, under the circumstances, use of potentially deadly force was reasonable as a matter of law; the officers are entitled to qualified immunity; and the municipalities and county cannot be held liable absent an underlying constitutional violation.

An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated constitutional rights. *Pearson v. Callahan*, 129 S. Ct. 808, 822 (2009) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). We use the Fourth Amendment, which prohibits unreasonable seizures, to analyze claims that law enforcement officers used excessive force. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Pre-seizure police conduct cannot serve as a basis for liability under the Fourth Amendment; we limit our analysis to force used when a seizure occurs. "A Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007) (citing *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989)).

Whether the force used to effect a seizure is excessive depends on the totality of circumstances under an objective reasonableness standard. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. The Supreme Court further has counseled that it is reasonable for a law enforcement officer to use deadly force if an objectively reasonable officer in the same circumstances would conclude that the suspect posed a threat of death or serious physical injury to the officer or to others. *Tennessee v. Gardner*, 471 U.S. 1, 11-12 (1985).

The Supreme Court recently decided a § 1983 police pursuit case, *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769

(2007). In *Scott*, a police officer attempted to pull Victor Harris over for speeding. Harris fled in his vehicle, initiating a high-speed car chase. Deputy Timothy Scott attempted to end the chase by ramming Harris's vehicle with his police cruiser. Harris crashed and was rendered a quadriplegic. 127 S. Ct. at 1772-73. Harris sued Scott, claiming that Scott had used excessive force in violation of his Fourth Amendment rights. The Court ruled that Scott's actions were reasonable and did not violate the Fourth Amendment. The Court relied on a videotape of the chase to hold that "it is clear . . . that [Harris] posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase." *Id.* at 1778. The opinion weighed the need to prevent the harm Harris could have caused against the probability that Scott's use of force would harm Harris himself. The Court concluded: "A police officer's attempt to terminate a dangerous high speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Id.* at 1779.

In this case, the government seizure occurred in the highway median, when law enforcement officers finally terminated Marion's freedom of movement. While evidence demonstrates that throughout the chase Marion had very little regard for the safety of officers or innocent bystanders, we limit our analysis to whether Marion posed a serious danger to officers or innocent bystanders once he was in the median.

The evidence clearly demonstrates that, once in the median, Marion attempted to regain traction and drive toward the eastbound lanes of the highway, where many innocent bystanders were present. There is no question that he would have run over officers to reach the eastbound lanes and continue his flight eastbound, if he had the capability to do so.

The key question, though, is whether it was objectively reasonable for officers to conclude that Marion posed an actual threat to officers or innocent bystanders once he reached the median. Marion claims that his vehicle was stuck in the mud, had three flat tires, was overheating, and that an objectively reasonable officer in the same circumstances as defendants would conclude that he did not pose a danger to anyone at that time.

Despite Marion's contentions, it was reasonable for the officers to determine that he did actually pose a threat to the safety of officers and of innocent bystanders. While three of Marion's tires were flat, he had been able to travel on three flat tires at fairly high speeds for a significant stretch of time. Even after he entered the median and officers on foot surrounded his vehicle, the video evidence shows that Marion's vehicle continued to move forward significantly. Later, after he revved his engine, he was able to drive the vehicle backward as well. A reasonable officer would have concluded that, absent police intervention, Marion had the capability to run over officers and/or to reach the eastbound lanes of the highway. Moreover, a reasonable officer would have determined that, if he did reach the eastbound lanes, there

was a significant possibility that Marion would have rammed one or more bystander's vehicles or caused an accident between bystanders' vehicles, posing a substantial risk of serious injury or loss of life.

We conclude that, under the totality of the circumstances, it was reasonable for the officers to think that Marion seriously endangered officers and innocent bystanders, and it was reasonable for the officers to discharge their firearms in Marion's direction to stop him. Thus, there was no Fourth Amendment violation. Because there was no deprivation of a constitutional right in this case, the police officers are immune from liability. *Pearson*, 129 S. Ct. at 816; *Akande v. Grounds*, ___ F.3d ___, 2009 WL 291186 (7th Cir. Feb. 9, 2009) ("If it is clear that there has been no constitutional injury, . . . the officials are entitled to immunity") (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The district court correctly granted summary judgment in favor of all officers.

Furthermore, municipalities or counties cannot be liable under § 1983 absent an underlying constitutional violation by one or more of their officers. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Because we find no constitutional violation by the police officers, the district court correctly dismissed Marion's claims against the named municipalities and against the County of Harrison.

### III. Conclusion

Because we find that the officers' actions were objectively reasonable, we AFFIRM the district court's grant

of summary judgment in favor of any and all named defendants.