In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2523

ESTATE OF WILLIAM E. WILLIAMS,
*et al.*,

*Plaintiffs-Appellants*,

*v.*

INDIANA STATE POLICE DEPARTMENT,
*et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:12-cv-00324-JMS-DKL — **Jane E. Magnus-Stinson**, *Judge.*

No. 14-2808

NANCY BROWN,

*Plaintiff-Appellee,*

*v.*

WAYNE BLANCHARD and WALWORTH
COUNTY, WISCONSIN,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:13-cv-00511-LA — **Lynn Adelman**, *Judge.*

BOTH ARGUED JANUARY 20, 2015
BOTH DECIDED AUGUST 13, 2015

Before RIPPLE and ROVNER, *Circuit Judges*, and KENNELLY,
*District Judge.*[*]

ROVNER, *Circuit Judge.* We have consolidated for decision
these two appeals, heard on the same day, that present similar
issues of law relating to the reasonableness of force under the
Fourth Amendment. In both cases, family members called
police officers to their home because a family member had

---

[*] The Honorable Matthew F. Kennelly, United States District Court for the
Northern District of Illinois, sitting by designation.

locked himself in a room of his home and was threatening suicide. The officers responded to the distress call, but in both cases the situation tragically ended with the person's death as a result of shots fired by the officers. Although we will discuss the facts in more detail later, the basic circumstances were as follows. In the case on behalf of the estate of Williams, the police officers were faced with a person, William E. Williams, who had locked himself in a bathroom, had taken all the Xanax left in a prescription bottle, and had cut himself and complained that it was taking longer than expected for him to bleed out. The officers had no good vantage point to see him in the second floor bathroom, and he repeatedly threatened to kill anyone who attempted to come into the bathroom. The officers unlocked the bathroom door and fired tasers at Williams, but those tasers had no effect. When Williams pursued the officers with a knife, the officers shot and killed him. In the case brought by Nancy Brown, John Brown had also cut himself, and was locked in his bedroom although his mother had a key and had come in and spoken with him. Officers could see him through the bedroom window. Shortly after arriving, an officer at the scene decided to kick the bedroom door in, and ultimately he fatally shot John Brown who also possessed a knife. On behalf of the deceased person, the plaintiffs in each case brought suit against the officers pursuant to 42 U.S.C. § 1983, alleging that the officers used excessive force in violation of the Fourth Amendment when they effected the seizure.

## I.

Because the Fourth Amendment explicitly addresses the sort of physically intrusive government conduct that constitutes a seizure, that amendment rather than generalized

notions of substantive due process guides such claims. *Graham v. Connor*, 490 U.S. 386, 395 (1989). In determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment, we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion. *Id*. at 396; *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013); *Abbott v. Sangamon County, Illinois*, 705 F.3d 706, 724 (7th Cir. 2013). Such an analysis is inherently fact-dependent, requiring consideration of such factors as the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers. *Graham*, 490 U.S. at 396; *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014); *Abbott*, 705 F.3d at 724. In assessing such a claim, however, we must remain cognizant of the incredibly difficult task facing law enforcement officers called to address fluid situations such as those presented in these cases. Accordingly, the reasonableness of an officer's actions must be assessed from the perspective of a reasonable officer on the scene, not based on the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *Fitzgerald*, 707 F.3d at 733; *City and County of San Francisco, California v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1775 (2015). That assessment must include a recognition that officers are often forced to make split second judgments in tense, uncertain, and rapidly evolving situations, as to the amount of force necessary in a particular situation. *Graham*, 490 U.S. at 396-97; *Abbott*, 705 F.3d at 724; *Sheehan*, 135 S. Ct. at 1775. We thus give considerable leeway to law enforcement officers' assessments regarding the degree of force

appropriate in dangerous situations. *Abbott*, 705 F.3d at 724-25. Throughout the analysis, the reasonableness inquiry is an objective one, which examines whether the officer's actions are objectively reasonable in light of the totality of the facts and circumstances confronting him or her, without regard for consideration of the officer's subjective intent or motivations. *Graham*, 490 U.S. at 397; *Miller*, 761 F.3d at 828-29; *Fitzgerald*, 707 F.3d at 733. An officer's use of force is unreasonable if in light of all those circumstances at the time of the seizure, the officer used greater force than was reasonably necessary to effectuate the seizure. *Id*. "The Supreme Court further has counseled that it is reasonable for a law enforcement officer to use deadly force if an objectively reasonable officer in the same circumstances would conclude that the suspect posed a threat of death or serious physical injury to the officer or to others." *Marion v. City of Corydon, Indiana*, 559 F.3d 700, 705 (7th Cir. 2009), citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985).

If we determine that the use of force was excessive under that constitutional standard, we must turn to the next question, which is whether the officers are entitled to qualified immunity for their actions. "Qualified immunity, in effect, affords enhanced deference to officers' on-scene judgments about the level of necessary force … because, even if the plaintiffs demonstrate that excessive force was used, they must further establish that it was objectively unreasonable for the officer to believe that the force was lawful–i.e., they must demonstrate that the right to be free from the particular use of force under the relevant circumstances was 'clearly established.'" *Abbott*, 705 F.3d at 725. For qualified immunity purposes, a right is clearly established if the contours of that right are sufficiently

clear that a reasonable officer would understand that his actions violate that right—"[i]n other words, 'existing precedent must have placed the … constitutional questions beyond debate.'" *Id*., quoting *Reichle v. Howards*, ___ U.S. ___, 132 S. Ct. 2088, 2093 (2012); *Sheehan*, 135 S. Ct. at 1774.

In both cases before us today, the district court was presented with a motion for summary judgment. In *Williams*, the court granted summary judgment in favor of the officer defendants, concluding that the officers were entitled to qualified immunity. The plaintiffs now appeal that determination. In contrast, the district court in *Brown* denied summary judgment to the officers on the constitutional claim as well as on the issue of qualified immunity. The defendants appealed that denial to this court. See *Weinmann v. McClone*, 787 F.3d 444, 447 (7th Cir. 2015)(discussing the appealability of denials of qualified immunity).

The Supreme Court recently addressed a Fourth Amendment challenge in circumstances analogous to the ones presented here in *Sheehan*, 135 S. Ct. 1765, and its analysis is instructive. Teresa Sheehan resided in a group home for persons dealing with mental illness. *Id.* at 1769. Sheehan's mental condition appeared to be deteriorating to the extent that she had stopped taking her medications, no longer spoke with her psychiatrist, and reportedly had stopped changing her clothes or eating. *Id.* When the social worker used a key to enter Sheehan's room, Sheehan yelled at the social worker to get out and shouted that she had a knife and would kill the social worker if necessary. *Id.* at 1769-70. Police officers were then called to the group home. The officers knocked on

Sheehan's door, announced who they were, and indicated that they wanted to help Sheehan. *Id.* at 1770. When Sheehan failed to respond, the officers entered the room using a key, and again Sheehan responded in a violent manner. Sheehan grabbed a knife and began approaching the officers, yelling that she was going to kill them, that she did not need help, and that they should get out. *Id.* The officers left the room, but determined that immediate action was required, and chose not to wait for the backup that was already on the way. *Id.* at 1771. One officer then pushed the door open while the other began using pepper spray on Sheehan. *Id.* Sheehan did not drop the knife, however, and when Sheehan was within a few feet of the officers, one of the officers shot her twice. *Id.* When she failed to collapse, the other officer fired multiple shots at her. *Id.* Sheehan survived the incident, and ultimately brought a § 1983 challenge alleging that the officers violated her Fourth Amendment right against unreasonable seizures.

The Ninth Circuit held that although the initial entry into the room was lawful, and the firing of the shots was reasonable when the pepper spray failed to stop Sheehan's advance, a jury could find that the officers provoked Sheehan by needlessly forcing that second confrontation. *Id.* at 1772. The majority also denied the claim of qualified immunity, holding that "it was clearly established that an officer cannot 'forcibly enter the home of an armed, mentally ill subject who had been acting irrationally and had threatened anyone who entered when there was no objective need for immediate entry.'" *Id.*, quoting *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1229 (9th Cir. 2014).

The Court reversed the Ninth Circuit on the qualified immunity issue. The Court agreed that the officers did not violate any federal right when they opened Sheehan's door the first time, because "'[l]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Id.* at 1774-75, quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Moreover, the Court recognized that the second entry was also constitutionally permissible because it was part of a continuous search or seizure, and the officers knew that Sheehan had a weapon and had threatened to use it to kill three people, and that delay could make the situation more dangerous. *Id.* at 1775. Under the reasonableness standard of the Fourth Amendment, the Court held that it was reasonable for police to move quickly "if delay 'would gravely endanger their lives or the lives of others,'" even if the actions proved with the benefit of hindsight to be a mistake. *Id.*, quoting *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-99 (1967). The Court noted that the Constitution is not blind to the need for officers to make split second judgments. *Id.* The Court further agreed that upon opening the door the second time, the officers' use of force was reasonable–from the initial use of pepper spray to the escalation to deadly force in an effort to protect themselves. According to the Court, the "real question" in the case was whether the Fourth Amendment was violated when the officers opened the door for the second time rather than attempting to accommodate her disability. In other words, the Court considered whether the knowledge of her disability impacted the reasonableness of the officers' actions. Because the briefing focused on this issue in the context of whether the

officers had qualified immunity, the Court proceeded directly to the question of whether the officers' failure to accommodate Sheehan's illness violated clearly established law.

The Court held that the cases relied upon by the Ninth Circuit panel majority were insufficient to constitute the type of clearly established law that would jettison qualified immunity. For instance, the Court stated that the Ninth Circuit's reliance on *Graham v. Connor*, 90 U.S. 386 (1989), was misplaced because *Graham* established only that the objective reasonableness test applies to excessive force claims and that was "far too general a proposition to control this case." *Sheehan*, 135 S. Ct. at 1775. The Court emphasized that it had repeatedly told courts not to define clearly established law at a high level of generality. "Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as a right to be free from unreasonable searches and seizures." *Id.* at 1776. In comparing the facts of the cases relied upon by the Ninth Circuit panel majority, the Court determined that the facts were too dissimilar to control the case. Moreover, the Court noted that a Fourth Amendment violation could not be established by merely demonstrating that bad tactics resulted in a deadly confrontation that could have been avoided. *Id.* at 1777. Nor did it matter, for qualified immunity purposes, that an expert testified that the officers failed to follow their training as to how to handle mentally ill persons in such scenarios. *Id.* "Rather, so long as 'a reasonable officer could have believed that his conduct was justified,' a plaintiff cannot '[a]void summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless.'" *Id.*,

quoting *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002). The Court noted that even if the Ninth Circuit panel majority had properly concluded that its cases would have put officers on notice that it was unreasonable to forcibly enter the home of an armed, threatening, mentally ill suspect absent an objective need for immediate entry, qualified immunity was proper because no precedent clearly established that there was no objective need for immediate entry here. *Id.* at 1777. Because the officers had no fair and clear warning of what the Constitution required in the situation that they faced on that day, qualified immunity applied. *Id.* at 1778. *Sheehan* thus cautions against interpreting the "clearly established law" requirement too broadly and substituting general propositions of law for cases that are factually similar enough to apprise the officers of the contours of the constitutional protections due in the situation. We turn then, to the application of *Sheehan* and the other cases set forth above, to the facts of the individual cases before us, largely drawing from the thorough presentation of facts set forth in the comprehensive district court decisions.

## II.

On the evening of January 15, 2012, William (Bill) Williams sent a text message to his sons Tyler and Jacob which caused them to fear that he was going to commit suicide. Both sons proceeded to the home. When Jacob arrived at the home, he broke down the locked bedroom door, and discovered that his father had locked himself into the bathroom adjoining the bedroom. His father threatened to kill Jacob if he came into the bathroom. Jacob informed the 911 dispatcher that his father was probably going to shoot himself and that his father threatened to stab him if he opened the bathroom door. In the

meantime, Williams' sister and her boyfriend arrived at the home. In response to the 911 contact, Putnam County deputy sheriff John Chadd, Cloverdale police officer Charles Hallam, and Indiana State Police officer Brian Thomas arrived at the scene. Those responders were later joined by officers Patrick Labhart and Chris Springstun of the Indiana Department of Natural Resources. For the sake of brevity, we will refer to all of the law enforcement responders collectively as "officers" in this opinion whether deputy sheriffs or officers and regardless of agency. The dispatcher informed Chadd and Hallam that Williams may have cut his wrists. Chadd asked the dispatcher to contact the Putnam County Sheriff's Department negotiator, but the dispatcher was unable to reach the negotiator.

At some point around that time, Chadd and Labhart used a stepladder outside the home in an attempt to see inside the window of the bathroom. The appellants vehemently dispute the officers' claim that they could see blood in the bathroom from the vantage point on the ladder, but that dispute is immaterial in this case because there is no dispute that Williams in fact had cut himself in an attempt to commit suicide and that the officers were aware of that fact. The appellants argue that the extent of Williams' injuries is material because the officers testified that the amount of blood factored into their decision to subsequently unlock the bathroom door and confront Williams. The subjective motivation of the officers, however is irrelevant because the assessment as to the reasonableness of the force used in a seizure is an objective test. As we noted above, courts consider only whether the officers' actions are objectively reasonable in light of the totality of the facts and circumstances confronting them, regardless of the

officers' subjective motivations. *Graham*, 490 U.S. at 397; *Miller*, 761 F.3d at 828-29. As will be discussed later, the undisputed evidence established that Williams had engaged in behavior that endangered his life and necessitated action by the officers, and therefore we need not consider whether additional evidence in the form of visual observation of blood in the bathroom was also undisputed.

While some of the officers were attempting to see into the bathroom, Hallam spoke with Williams from within the bedroom. Hallam asked Williams what was going on, to which Williams responded "Who the f— are you?" After Hallam identified himself as a Cloverdale police officer and asked Williams how he was doing, Williams responded "Get the f— out of here. Get the f— out of my house. Leave me alone." Williams threatened to stab Hallam or anyone else who opened the door.

The appellants dispute that Hallam spoke with Williams and thus contest whether Williams was ever aware that officers were in the house, arguing that it is relevant to whether the subsequent actions were objectively reasonable. The district court, however, properly resolved this issue, and we agree with its reasoning. Hallam testified that he spoke with Williams alone, but appellants rely on the testimony of four officers that they did not hear Hallam communicate with Williams. That does not contradict Hallam's testimony, and in fact is consistent with his testimony that he was alone when he communicated with Williams. Moreover, three officers testified that Hallam informed them at the time that he had spoken with Williams. The appellants did not present evidence disputing that testimony, such as evidence that Hallam was never alone

in the bedroom and thus could not have had that conversation. The only other evidence relied upon by the appellants are subsequent conversations the officers had with Tyler, who arrived at the home after the time at which Hallam had the conversation with Williams. At that time, other officers were present in the bedroom and they informed Tyler to keep his voice down because Williams did not know they were there, and cautioned him to not let his father know that any law enforcement was present. That conversation does not contradict Hallam's testimony that he had a prior conversation with Williams, and in fact their desire to keep Williams in the dark as to their presence in the room is consistent with the testimony that Williams became agitated when Hallam identified himself as an officer and demanded that Hallam leave the house. In short, the appellants have presented no evidence to dispute that Hallam spoke with Williams. The officers' instruction not to alert Williams that they were gathering outside the bathroom does not support an inference that Hallam therefore did not communicate with Williams earlier in the ordeal. Mere speculation is insufficient to raise a genuine issue of fact.

It is undisputed that in the officers' presence, Tyler spoke with Williams through the bathroom door. In that conversation, Williams told Tyler that he had knives and an injecting needle used to marinate turkeys. He further stated that he had taken the rest of his bottle of Xanax and that he had cut himself, but that it had "taken longer than planned," and was not "going as fast as the internet said," but that he needed 30 more minutes and he would be done. He also asked Tyler to get him a gun.

Chadd told Tyler to let Williams believe that he had a gun in an attempt to lure him out, and even placed his own gun on the floor outside the door so Williams could see it when Williams demanded evidence of the gun. Williams still could not see the gun, however, and refused to open the door.

The officers had discussed with Williams' mother how to open the locked bathroom door from the outside, and she had provided them with a Q-Tip with the top removed, which could be used to "pop" the lock on the door. After the attempt to lure Williams out with the gun failed, the officers decided to unlock the door in that manner at which time Chadd and Hallam would tase Williams and then handcuff him. The testimony is contradictory as to whether the plan was to open the door and tase him only if he failed to come out voluntarily, or to immediately tase him without warning. When the officers unlocked and opened the door, Williams was standing at the sink facing the mirror, with two knives sitting on the sink by his hands - - each knife measuring approximately a foot long. Williams turned towards the doorway, and Chadd and Hallam fired their tasers at him (either simultaneously or in short succession). The tasers unfortunately had no effect on Williams, who exited the bathroom towards Chadd and Hallam while raising a knife above his head. Chadd and Hallam backed away from Williams, who turned toward Hallam and continued to follow him as Hallam backed up and moved around the bed. When Hallam rounded the final corner of the bed, he fired at Williams but missed, and subsequently fired a second shot that hit Williams. Hallam then continued backing up until he fell on the bed. Williams fell on top of Hallam and his knife cut one of Hallam's fingers. When there was a brief

separation of Hallam and Williams, other officers fired at Williams as well, and he was fatally struck. Approximately 2-4 seconds elapsed from when Williams exited the bathroom to when he was shot, and around 29 minutes from when the officers first arrived at the home to the tragic culmination of events.

The appellants maintain that the use of force against a subject who is not actively resisting violates clearly established law and the officers accordingly are not entitled to qualified immunity. They argue that the district court failed to view the facts in the light most favorable to Williams, and if the court had properly considered the evidence it would have determined that Williams was not actively resisting. We have already discussed the appellants' arguments relating to the officers' ability to see into the bathroom window, and as to whether there is a dispute of fact that Hallam spoke with Williams. The appellants additionally argue that the district court improperly weighed evidence when it considered Williams' threats to kill anyone who entered the bathroom and determined that those statements established probable cause to believe Williams had committed felony intimidation. The appellants assert that threatening statements cannot be criminal unless the speaker intended to communicate a "true threat," and that there is a dispute as to whether Williams intended to harm anyone because family members testified that they did not believe Williams intended to harm anyone. As an initial matter, we note that the repeated explicit threats by Williams, coupled with his possession of a weapon and his refusal to cooperate or exit the bathroom, provided an objective basis for the officers to believe that he posed a threat to the

safety of himself and others. The family members' subjective interpretations do not alter that, and here the family members' actions do not even support that characterization of their subjective state of mind. Although the family members entered into the locked bedroom, and had the ability to unlock the bathroom with a Q-Tip in their possession, none of the family members did so after speaking with Williams and being told that he would kill anyone who entered. Their actions are consistent with a concern that he could harm himself or others, not with a belief that his threats were merely idle ones.

The *Sheehan* decision discussed above addressed a similar situation. In the present case, as the Court held in *Sheehan*, the officers were entitled to enter Williams' room "to render emergency assistance to [the] injured occupant or to protect [the] occupant from imminent injury." *Sheehan*, 135 S. Ct. at 1774-75 (internal quotations marks omitted). Specifically, it is undisputed that the officers were aware that Williams had cut himself in an attempt to commit suicide and that he told his son Tyler, in the officers' presence, that he had taken a large quantity of Xanac in an effort to harm or kill himself that was "tak[ing] longer than planned." Under the rule as announced in *Sheehan*, it is of no consequence for purposes of the Fourth Amendment that Williams' injury and imminent injury were self-inflicted; the officers were not required to allow him to carry out his suicide attempt. When the officers entered Williams' room, they initially attempted to take control of him without using deadly force. As we discuss later, their initial use of the tasers was appropriate under constitutional standards given Williams' possession of a knife and his threat to stab anyone who entered. When that was unsuccessful, and

Williams advanced on them brandishing the knife, the officers acted reasonably in using deadly force; plaintiffs do not argue otherwise.

That brings us to the appellants' related argument, which is that a reasonable officer, upon opening the bathroom door, would have been able to see that Williams was not at risk of bleeding out and therefore there were no exigent circumstances necessitating action. Once again, the Supreme Court and this court have repeatedly rejected that type of second-guessing of the split second decisions officers are forced to make in confronting rapidly evolving situations. *Id.* at 1775. Williams had acknowledged that he had cut himself and that it was taking longer than he thought to lose sufficient blood to end his life, and had also admitted to taking all of the remaining Xanax pills in his possession in an attempt to end his life. He also threatened to kill anyone who entered. Faced with those undisputed facts, as a matter of law the officers possessed an objectively reasonable belief that action was needed to avoid the threat to his life and the potential threat to others inherent in the danger that he could emerge in that agitated state with the knives. The appellants argue that no exigency was present because Williams had not lost consciousness and "it is generally well known that most suicide attempts are not successful, unless a gun is used," and in support point to the testimony of a forensic pathologist that only 20-50% of suicide attempts are successful. This rather astounding argument is unavailing. Setting aside the obvious question that perhaps non-firearms suicide attempts are unsuccessful precisely because timely aid is rendered, the argument would alter the standard to one that would allow officers to act only in the

event of imminent death. There is no support for such a standard that would prohibit officers from rendering aid to a person who has already harmed himself, or that would require them to wait until a hostile person emerged and attacked others before attempting to defuse the situation, and it is inconsistent with *Sheehan*.

Finally, no clearly established law renders the officers' use of force unreasonable in light of the circumstances that they faced. Williams' presence in the confined space of a bathroom, inaccessible from the outside, presented the officers with limited options, which was further impacted by the space limits of the bedroom that adjoined it. The decision to employ tasers immediately upon opening the bathroom door was a reasonable use of force to subdue a person who potentially presented an immediate threat to himself and the officers once that door was opened. Under the qualified immunity standard, the appellants must demonstrate that "the right to be free from the particular use of force under the relevant circumstances was 'clearly established.'" *Abbott*, 705 F.3d at 725. Rather than establishing that such force was impermissible, our cases repeatedly have upheld the use of non-lethal force such as tasers in such situations. We have described tasers as "falling somewhere in the middle of the nonlethal-force spectrum." *Id.* at 726. Although describing it as more than a *de minimis* application of force and recognizing the pain that it can cause, "we have also acknowledged that the use of a taser, like the use of pepper spray or pain-compliance techniques, generally does not constitute as much force as so-called impact weapons, such as baton launchers and beanbag projectiles." *Id.* We have upheld its use in a situation in which a person was refusing to

move from a doorway and an officer believed that fellow officers in the blocked room needed assistance, *Clarett v. Roberts*, 657 F.3d 664, 674-75 (7th Cir. 2011), and where a defendant "displayed an unwillingness to accede to reasonable police commands, and his actions suggested an intent to use violence to fend off further police action," *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011). *Abbott*, 705 F.3d at 727-28.

In contrast, the appellants have failed to present any case that would establish that the use of a taser in a scenario such as this one is excessive. Their arguments rest essentially on the characterization of Williams' actions as passive rather than active resistance without any real sense of urgency or threat to others, which is premised on the speculative notion that his threats were idle ones. Moreover, their assertion that the officers should have been able to ascertain once the door was open that Williams was not in immediate danger of death and did not pose a threat is unavailing for multiple reasons. First, he was standing at the sink with two large knives on the sink next to his hands, and turned toward the door as it opened. That is not evidence that he had abandoned his threat to kill those who tried to enter. Moreover, courts have repeatedly rejected any attempt to hold officers to such an impossible standard of altering their conduct based on the split-second unfolding of events. For instance, in *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009), we held that an officer did not act unreasonably in striking a shooting suspect several times until the suspect was handcuffed, despite evidence that immediately prior to that the shooting suspect had turned and offered to surrender when cornered in a residential yard. We held that

the suspect was not known to be subdued when the pursuers applied force. We have since noted that "[t]he critical fact in *Johnson* was that the officer 'had no idea how Johnson was going to behave once he was cornered.'" *Miller*, 761 F.3d at 830, quoting *Johnson*, 576 F.3d at 660. The officers in this case similarly could not know how Williams would react to the opening of the door, other than Williams' own words that he would try to kill them, and their decision to employ non-lethal force to avoid that danger was reasonable. The appellants here, like the plaintiffs in *Sheehan*, cannot point to any case involving a dangerous, obviously unstable person in possession of a weapon, making threats, which would have put the officers on notice that their conduct was constitutionally impermissible. Accordingly, the officers were entitled to qualified immunity for their decision to open the door and utilize the tasers.

Once the tasers were employed without effect, the officers were presented with a person advancing towards them with a knife, and in fact one officer was ultimately stabbed by Williams. The appellants do not contest that the officers acted reasonably in firing the shots at that point. Accordingly, the district court properly held that the officers were entitled to qualified immunity.

### III.

We turn then to the facts in *Brown*. Late in the evening on May 4, 2012, John Brown, who was 22 years old, left voice and text messages with friends indicating that he was contemplating suicide. One of those friends contacted his mother, Nancy Brown, who resided in the mobile home with John, and informed her that John was in his bedroom and that he was

hurting himself. Nancy immediately went to check on John, and after unlocking his bedroom door with a key, found him sitting at his computer desk, crying and holding a folding knife. He was bleeding from his wrist. Nancy rushed over to John and tried to take the knife from him, but he refused to let go of it. She then held his head in her arms and told him she was going to get help. John locked the door again when Nancy exited the bedroom to call 911.

Nancy informed the dispatcher that her son was attempting to commit suicide and had a knife. She further stated that there were no other weapons in the bedroom, that John was bipolar and refused to take his medication, and that he had been drinking heavily and had cut himself in the past.

Deputy Christopher Such was the first to arrive at the mobile home. He spoke with Nancy, and then proceeded down the hallway to the bedroom door. Such identified himself to John through the closed door. Loud music could be heard in the bedroom, and John did not initially respond. Such then prompted John by asking if John remembered Such from a prior encounter in which Such has given John a ride to a nearby city. According to Such's affidavit, John responded "f—you," but Nancy maintains that he did not so respond.

Shortly thereafter, at 12:14 a.m., Deputy Wayne Blanchard arrived at the scene. The sequence of events that followed his arrival transpired quickly, because by 12:16 a.m, two minutes after Blanchard's arrival, Blanchard had shot and killed John. The facts as to what transpired in that time are in dispute. Blanchard in his affidavit states that he spoke with Nancy who conveyed the same information to him as she had to Such, and

then Such briefed him on his communication through the door with John. Blanchard removed his gun from the holster and proceeded to the bedroom door, while Such went outside and looked through John's window. Such radioed to Blanchard that John was sitting at his computer desk drinking a beer and smoking a cigarette, with his back to the bedroom door. Declining Nancy's offer of a key to unlock the bedroom door, Blanchard determined that he would instead kick in the bedroom door so that John would not have time to access any other weapons (although Nancy stated that she had informed the dispatcher that no other weapons were in the bedroom, and the dispatcher relayed all information to the deputies). Nancy proceeded back down the hallway and sat down on a sofa in the living room, from which she could hear but could not see the subsequent events.

According to Blanchard, he then kicked down the bedroom door and then took a step back to position himself. Such then ran back into the mobile home and positioned himself behind Blanchard, drawing his taser in the process. They observed John sitting at the computer desk as described by Such in the radio communication. Blanchard ordered John to show his hands, but John briefly glanced at Blanchard and ignored the order. Blanchard repeated the order and John again ignored it. John then stood up, and the affidavit statements of Such and Blanchard are jarringly similar in the description of John. They both stated that John turned toward them in a "Frankenstein-like" manner. They observed blood on John's left arm, and he was holding a folding knife in his hand. John gave them a "thousand-yard stare," walked to the bedroom door and slammed it closed. Blanchard immediately kicked the door in

a second time, pointed the gun at John who was halfway between the door frame and his desk, and ordered John to drop the knife. John told Blanchard that Blanchard would have to shoot him, and then, according to both deputies in yet another similar description, John "rolled his shoulders forward," started moving the knife "in an upward position" and began advancing towards Blanchard. When John was within 5 or 6 feet of Blanchard, Blanchard fired two shots at him resulting in his death.

Nancy heard the exchange from her position in the living room, and her statement differs from those of the deputies in critical ways. Specifically, she stated that she did not hear Blanchard tell John to drop the knife, but before she heard Blanchard kick in the door, she heard one of the deputies call John's name twice. She then heard John say "fine, come in and shoot me between the eyes and kill me." She then heard the door being kicked, slammed shut, and kicked in a second time, followed directly by two gunshots. Under her version, therefore, after the door was kicked in the second time, John was never ordered to drop his knife and did not state that they would have to kill him. The district court held that Nancy's testimony created a genuine issue of fact as to whether John was in fact threatening the officers with a knife at the time he was shot. The court held that Nancy could not see whether John raised his knife, but her testimony as to what she heard cast doubt on the veracity of the deputies' version of events, and thus it was a question for the jury. Because this is an interlocutory appeal from the denial of qualified immunity, our review is limited in scope. We may review the purely legal question of whether "a given set of undisputed facts demon-

strates a violation of clearly established law," but we may not review the record "'to determine whether the district court erred in finding that a genuine issue of material fact exists.'" *Gutierrez v. Kermon*, 722 F.3d 1003, 1009 (7th Cir. 2013), quoting *Via v. LaGrand*, 469 F.3d 618, 624 (7th Cir. 2006); *Leaf v. Shelnutt*, 400 F.3d 1070, 1078 (7th Cir. 2005). Accordingly, in determining whether the district court properly denied qualified immunity, we accept the district court's determination that there was a genuine issue of fact as to whether John was raising the knife and advancing toward the deputies at the time he was shot.

In denying the motion for summary judgment based on qualified immunity, the district court identified two factual scenarios under which, in its view, a jury could find that Blanchard unreasonably had seized John. The first theory of liability considered by the district court is that Blanchard unreasonably created an encounter that led to the use of force against John. According to the district court, Blanchard could be liable under that theory even if he established that he reasonably thought John was advancing on him with an upraised knife, if the jury found that Blanchard's actions in kicking in the door were not reasonably calculated to prevent John from harming himself, which was the only legitimate ground for initiating a seizure.

Blanchard argues that the district court erred in denying qualified immunity on that ground, because it was not clearly established that pre-seizure conduct of a law enforcement officer can violate the Fourth Amendment's prohibition of unreasonable seizures. Blanchard is entitled to qualified immunity unless existing precedent placed the constitutional

question beyond debate.  *Abbott*, 705 F.3d at 725.  That standard is not met here.  Our caselaw is far from clear as to the relevance of pre-seizure conduct, or even as to a determination as to what conduct falls within the designation "pre-seizure," although the majority of cases  hold that it may not form the basis for a Fourth Amendment claim.  *Compare Marion*, 559 F.3d at 705 ("Pre-seizure police conduct cannot serve as a basis for liability under the Fourth Amendment; we limit our analysis to force used when a seizure occurs."), *and McCoy v. Harrison*, 341 F.3d 600, 605 (7th Cir. 2003) ("Even unreasonable, unjustified, or outrageous conduct by an officer is not prohibited by the Fourth Amendment if it does not involve a seizure." (alteration omitted) (internal quotation marks omitted)), *and Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992) ("[P]re-seizure conduct is not subject to Fourth Amendment scrutiny."), *with Sledd v. Lindsay*, 102 F.3d 282, 288 (7th Cir. 1996) (noting that if an officer fails to identify himself the normal rules governing the use of deadly force are modified, and discussing the Sixth Circuit's determination that an officer violates the Fourth Amendment if he "unreasonably create[s an] encounter that [leads] to a use of force" by "entering a private residence late at night with no indication of identity"), *and Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) (holding that an officer violates the Fourth Amendment if he "unreasonably create[s an] encounter" in which an individual would be "unable to react in order to avoid presenting a deadly threat to [the officer]"); *see also* Aaron Kimber, Note, *Righteous Shooting, Unreasonable Seizure? The Relevance of an Officer's Pre-Seizure Conduct in an Excessive Force Claim*, 13 Wm. & Mary Bill Rts. J. 651, 673 (2004) ("The Seventh Circuit has been inconsistent in how it allows pre-seizure conduct to be utilized by a plaintiff.").  The district court acknowledged that "no case precisely

identifies Blanchard's conduct as the kind of 'unreasonable conduct' that creates a dangerous situation," but concluded that it nevertheless would have been obvious to a reasonable officer in Blanchard's position. Dist. Ct. Decision and Order at 12 (July 17, 2014). Given the lack of clarity in cases in this area, we disagree that Blanchard was on notice that his conduct leading up to the encounter could itself be the basis for Fourth Amendment liability. See *Sheehan*, 135 S. Ct. at 1775-76 (cautioning against defining clearly established law at a high level of generality).

That does not mean that Blanchard's pre-seizure conduct is irrelevant to the Fourth Amendment claim. The sequence of events leading up to the seizure is relevant because the reasonableness of the seizure is evaluated in light of the totality of the circumstances. *Deering v. Reich*, 183 F.3d 645, 649-52 (7th Cir. 1999). For instance, the short period of time that elapsed from Blanchard's arrival to the confrontation, and his abrupt action in kicking in the door, give context to John's possession of the knife that might be different if John had himself opened the door holding the knife. The circumstances known by Blanchard, or even created by him, inform the determination as to whether the lethal response was an objectively reasonable one. *Id.* But our caselaw does not clearly establish that an officer may be liable under the Fourth Amendment solely for his pre-seizure conduct that led to the encounter. See *Graham*, 490 U.S. at 395 (claim of excessive force in the course of a seizure should be analyzed under the Fourth Amendment reasonableness standard rather than under the substantive due process approach); *Carter*, 973 F.2d at 1332("[t]he Fourth Amendment prohibits unreasonable seizures, not unreason-

able, unjustified or outrageous conduct in general.")

   The second theory of liability considered by the district court concerns whether Blanchard is entitled to qualified immunity for using deadly force in the absence of probable cause to believe that John was threatening him at the time. Under this theory of liability, the issue is whether it is clearly established law that Blanchard could not constitutionally use lethal force against John in the circumstances facing Blanchard. On appeal, Blanchard argues both that the record establishes that he had probable cause to believe that John was raising the knife and advancing, and that even absent that John's possession of the knife in those circumstances were sufficiently threatening that he was entitled to qualified immunity. As we stated above, the first argument impermissibly seeks a review of the district court's determination that there is a genuine issue of fact as to whether John was advancing with the knife. Accordingly, we review only whether Blanchard is entitled to qualified immunity regardless of whether John was merely holding the knife or advancing with it.

   In contrast to the situation presented in *Williams*, in this case, Blanchard resorted to the use of lethal force as an initial matter, and he did so despite the possession of a taser by Such who was present at the scene. There may have been reasons for that choice, given the confined nature of the mobile home including a hallway that was only 2-1/2 feet wide thus limiting mobility, but the record is undeveloped as to that. We must balance the nature of the force used—from lethal through the spectrum of non-lethal options such as flash bang devices, bean bags, pepper spray and tasers—with the governmental interest at stake. Even focusing the reasonableness inquiry, as

Blanchard urges, on only the shooting itself as opposed to the second breach of the door that preceded it, the district court properly denied qualified immunity.

It is well-established—and has been since long before the shooting at issue here—that "a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Weinmann*, 787 F.3d at 448; *Marion*, 559 F.3d at 705; *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002); *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). Accordingly, we have repeatedly recognized that officers could not use significant force on nonresisting or passively resisting suspects. *Abbott*, 705 F.3d at 732; *Estate of Starks*, 5 F.3d at 233. If Nancy's description is accurate, and we must credit her version at this stage because the district court determined that it created a genuine issue of fact, then deadly force was used here even though John was merely passively resisting their entreaties, and in the absence of any threats of violence by John toward the deputies or anyone else. See *Phillips v. Community Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012) and *Estate of Escobedo v. Bender*, 600 F.3d 770, 780-81 (7th Cir. 2010) (discussing conduct constituting merely passive resistance). In fact, Nancy had entered the room and engaged in physical contact with John, and at no point did he threaten violence towards her nor did she express any concern with such a possibility to the deputies. Moreover, Such was able to see John through the outside window, and could observe his behavior. At that time, there was no indication that John posed a threat to others, and the extent to which he posed a threat to himself is not established

by this record, given that he was observed sitting, smoking a cigarette, drinking a beer, walking and talking and not in apparent immediate danger.

We addressed a strikingly similar factual scenario recently in *Weinmann*, 787 F.3d 444. In that case, Susan Weinmann called 911 to report that her husband, Jerome Weinmann, was in the garage threatening to kill himself and had access to a gun. *Id.* at 446. Within three minutes of arriving, the responding officer Deputy Patrick J. McClone decided to kick in the garage door to make an unannounced entry. *Id.* Although acknowledging that McClone never pointed the shotgun at him, McClone argued that it was undisputed that he perceived the weapon as being pointed in his direction, and he shot Jerome four times. *Id.* at 447. We held that McClone was not entitled to qualified immunity because the facts did not suggest that Jerome had put another person in imminent danger or was actively resisting arrest in circumstances warranting such force. *Id.* at 448-49. McClone knew only that Jerome had access to a firearm, was potentially suicidal, had not responded to the attempt to speak with him, and that sounds from inside the garage resembled pattering on cupboard doors. *Id.* at 449. We deemed those facts insufficient to suggest anything more than Jerome placing himself in imminent danger. *Id.* We also rejected the argument that the force was justified because of the danger inherent in entering an enclosed garage with a single entrance. *Id.*

The analysis is the same here. Under this theory of liability, Blanchard was faced with facts indicating that John posed a potential threat to himself, but there were no facts indicating

that he was a threat to others, and in fact his mother's testimony that she was able to enter the room, talk with him, and hold his head indicates otherwise. Blanchard does not even dispute that proposition. Instead, he argues once again that the undisputed testimony established that John was shot because he approached the officers with a knife in a threatening manner. Blanchard fails to acknowledge that the district court determined that there was a genuine dispute of fact as to that matter, and that we cannot review that determination in this interlocutory appeal. That dispute of fact casts doubt on the contention that immediately after the door was kicked in a second time, John voiced resistance and then walked toward Blanchard with the knife, and as in *Weinmann* the mere possession of the knife is insufficient to warrant summary judgment.  We are aware that officers responding to a scene in which a suicidal person is locked in a room are faced with the difficult determination as to whether delay in responding will allow the person to further harm himself or to become aggressive toward others. It is clearly established, however, that officers cannot resort as an initial matter to lethal force on a person who is merely passively resisting and has not presented any threat of harm to others. Blanchard is not entitled to qualified immunity under that theory of liability, and thus the district court properly denied the motion for summary judgment.

Accordingly, the decisions of the district courts in *Williams* and *Brown* are AFFIRMED.