In The

# United States Court of Appeals
## For the Seventh Circuit

Nos. 11-2906 & 12-2950

JULIAN J. MILLER,

*Plaintiff-Appellant,*

*v.*

ALBERTO GONZALEZ and SHANE STANGE,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 09-C-1012 — **Rudolph T. Randa,** *Judge.*

ARGUED OCTOBER 29, 2012 — DECIDED AUGUST 5, 2014

Before WOOD, *Chief Judge*, CUDAHY and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge.* Julian Miller began the evening of October 24, 2003 at his mother's wedding reception, and

ended it in the back of a police cruiser with a broken jaw. Miller blamed two police officers from the Kenosha, Wisconsin police department for intentionally breaking his jaw and sued them under 42 U.S.C. § 1983 for violating his civil rights by using excessive force in effectuating his arrest. The district court granted the police officers' motions for summary judgment and Miller appeals.

## I.

Before entering his mother's 9:00 p.m. wedding reception, Miller and a friend smoked marijuana. At the reception, Miller drank three shots of vodka in an hour and a half. When the reception ended at approximately 10:00 p.m. or 10:30 p.m., Miller dropped off his girlfriend and then headed to a local bar in Kenosha. Before he entered the bar, he smoked some more marijuana and then topped off that high with three more Heineken beers before leaving for another bar at around 1:00 a.m. Apparently unready to go home, Miller headed off to one more bar, where he drank a few more beers and then bought a final Heineken for the road before heading off to a gas station where he planned to use the pay phone to call his girlfriend.

Just as Miller was driving to the gas station, the Kenosha police department received a call about a stabbing that occurred about two blocks away from the same gas station. Kenosha Police Officer Albert Gonzalez searched the surrounding neighborhood for the suspect while Officer Shane Stange interviewed the witness to the stabbing. That witness, who lived on the floor below where the stabbing occurred, told Stange that at around 1:40 a.m. he heard a knock at a side door that led to the upstairs apartment. After

hearing noises, the witness went out to the front porch where he saw someone wearing a dark hooded sweatshirt run around the house and then head west on 44th Street. The witness's upstairs neighbor shouted from the front yard, "Call the cops. I've been stabbed." The victim told the witness, who told Stange, that although the person who stabbed him was wearing a ski mask, he believed it was his ex-wife's boyfriend.

The sergeant in charge informed Gonzalez that the suspect fled west on 44th Street (the street on which the home was located) for one block and then headed south on 21st Avenue. Gonzalez walked that route until he reached the gas station one block west and one block south—at the corner of 21st Avenue and 44th place. As Gonzalez approached the gas station, he saw Miller's red car idling in a corner of the gas station. And as he got closer, he saw Miller exit the car drinking a beer. In answer to Gonzalez's inquiry, Miller denied seeing anyone running in the area. Gonzalez asked Miller his name to which Miller, knowing he was on probation, was driving without a license, and had been seen exiting his car with a beer, replied with the fake name, "Julius Johnson." When Gonzales asked Miller if he was on probation, Miller admitted that he was indeed on probation for burglary and disorderly conduct. Miller, who was becoming increasingly fidgety and nervous over the course of the exchange, placed his hands in his front pockets. Gonzalez instructed Miller to take his hands out of his front pockets and not to run. Miller switched his hands from his front pockets to his back pockets, took a step backwards and took off running with Gonzalez in pursuit.

Serendipitously, Miller headed north on 21st Avenue and then east on 44th Street, directly back toward the scene of the stabbing. Gonzalez's sergeant, who had been at the gas station, radioed Stange, who was still at the scene of the stabbing, that Gonzalez was pursuing a suspect and that they were headed in his direction. Stange emerged from the house in time to see Gonzalez chasing Miller east on 44th Street straight toward him. As Stange came down from the porch and identified himself as a police officer, Miller darted to the left and jumped a chest high chain link fence into a small yard.

As with his other choices that evening, this one was ill conceived. The yard was only six to seven feet wide by eight to ten feet deep. It was enclosed on the south and east sides by the chest high chain link fence, on the west side by the side of the garage, and on its north side by a tall wooden fence. The yard was overgrown with tall weeds and had a light shining into it from a nearby source. Once he jumped the fence, Miller was trapped. The wood fence and garage blocked the north and west of the yard respectively and Gonzalez was approaching from the south. Stange jumped the south fence after Miller and, with his gun drawn, ordered Miller to the ground. In response to Stange's command, Miller turned around, took a few steps away from the wooden fence, lay down on his stomach, and placed his arms spread-eagle out to his sides. According to Stange's version of the facts, Miller kept his arms under his body and ignored his repeated commands to place his hands behind his back, but because this case comes before us from a motion for summary judgment, we take all of the facts,

including this one, in the light most favorable to Miller, and construe all reasonable inferences from the evidence in his favor. *Townsend v. Cooper*, No. 12–3620, 2014 WL 3511731, *5 (7th Cir. July 17, 2014).

At this point, Miller was lying on the ground with his head pointing south toward 44th street and close to the chain link fence, his feet pointing north toward the wooden fence, and his face was on the ground turned to the east, toward the eastern side of the chain link fence. Seconds after Miller lay down on the ground in response to Stange's order, Gonzalez arrived. Gonzalez testified that he could not see Miller at all. Miller does not dispute this, but argues that he submitted competent evidence that the yard was lighted from a nearby source, and that any weeds in the yard did not cover the entire area such that they would hide him from view. Relying on this evidence, Miller asserts, a jury could reasonably discredit Gonzalez's claim that he could not see that Miller was spread-eagle on the ground and thus no longer a threat to anyone—an assertion we will explore more below. Gonzalez jumped the chain link fence and landed directly on Miller's head, breaking his left jaw.

As the officers handcuffed Miller and walked him to the car, Miller continued to resist and told Gonzalez, "You ain't have to break my jaw." In response, Gonzalez said, "I told you not to run."

On the way to the squad car, Miller told the officers, "I ain't going to say anything about this. Just let me go." The officers declined the deal and instead insisted that Miller receive medical care at the hospital where he had emergency surgery to repair his broken jaw. Miller's jaw was wired shut

for about six weeks and he was placed on a liquid diet and had pain that could not be controlled with over-the-counter pain medication. Miller now complains of a persistent click in his jaw when he opens his mouth.

Miller filed suit against Officers Stange and Gonzalez under 42 U.S.C. § 1983 claiming that the officers violated his Fourth Amendment rights by using excessive force during his arrest. Specifically, Miller alleged that Gonzalez used excessive force when he fractured Miller's jaw and that Stange was liable for failing to prevent Gonzalez from injuring him.

Gonzalez and Stange filed a motion for summary judgment arguing that no reasonable jury could find that their actions were objectively unreasonable because Miller's injuries resulted from an accident rather than through intentional acts, and that if it was purposeful, the force was reasonable given the circumstances that Miller might have been the stabbing suspect and that Gonzalez jumped the fence to assist a fellow officer who might have been being attacked. Stange argued that Miller's claim against him was factually unreasonable and legally insufficient because he was not in a position to intervene and he could not have anticipated nor prevented Gonzalez from injuring Miller. Finally, both defendants argued that they were entitled to qualified immunity because they did not violate a constitutional right.

The district court granted summary judgment to both officers. The court agreed that Stange "did not have time to do anything" to prevent the blow, and rejected as too "far fetched" the theory that Gonzalez could jump the fence and

land in a darkened, overgrown yard with enough precision to intentionally strike Miller's jaw. (R.62, p.8,9). For that reason, the court concluded that Miller had not shown any evidence of "intentional use of force that could be deemed excessive." *Id.* at 8. Because it found that the officers had not violated Miller's Fourth Amendment rights, the court did not reach the issue of qualified immunity.

After the district court entered judgment, Miller moved for relief under Federal Rule of Civil Procedure 60(b), based on a newly discovered written statement of the stabbing victim. In the statement, the victim reports that his assailant "appeared to be" a white male. Miller argued that this evidence undercuts the grant of summary judgment because he is a light-skinned African American thereby vitiating the reasonableness of Gonzalez's suspicion that he had committed a serious crime. Miller also pointed out that the police reports made no mention of a red vehicle. The court denied the motion, stating that the evidence would not change the outcome of the case. We have consolidated Miller's separate appeals from his underlying judgment and the denial of his Rule 60(b) motion.

On appeal Miller argues that we should vacate the grants of summary judgment. He contends that a reasonable jury could find that Gonzalez intentionally used excessive force during his arrest, and that Stange could have prevented it. Miller also argues that the statement of the stabbing victim he submitted with his Rule 60(b) motion should have caused the court to vacate the judgment against him because he showed that, during the chase, Gonzalez could not have reasonably believed that he was the stabbing suspect.

**II.**

We begin our de novo review of the grant of the motion for summary judgment against Stange, as the facts involving the claim against him are simpler. We review those facts in the light most favorable to Miller, the non-movant and construe all reasonable inferences from the evidence in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986); *Townsend*, 2014 WL 3511751 at *1.

A police officer can be liable for another officer's excessive force only if that officer had a realistic opportunity to intervene and stop the first officer's actions. *See Sanchez v. City of Chicago,* 700 F.3d 919, 925–926 (7th Cir. 2012); *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). A "realistic opportunity" means a chance to warn the officer using excessive force to stop. *See Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). But Stange had no reason to think that Gonzalez would strike Miller when he jumped into the yard, and thus no time to act until after the one blow to the jaw was over. Even if Stange thought Gonzalez was using excessive force, he could not have known it until the moment that Gonzalez landed on Miller's jaw, and by then it was too late. Even Miller claims that he did not see Gonzalez until the officer was "flying over the fence." (R. 53, p.2; R. 45–2, Deposition of Julian Miller at 51.). Miller argues that a jury could reasonably find that Stange had reason to believe that Gonzalez would jump over the fence into the yard and, in doing so, strike Miller. But Miller's speculation, hunches and intuition cannot defeat summary judgment. *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). Nor can Miller thwart

summary judgment by speculating as to Stange's state of mind. *Id.* Miller admits that Stange and Gonzalez did not plan the chase, the capture, or the arrest. And it is undisputed that Stange and Gonzalez were not together and therefore did not have time to confer or plan any sort of use of force or positioning of Miller on the ground before Stange jumped the fence. The only opportunity Stange would have had to intervene would have been as he saw Gonzalez jumping the fence, and by then there was no reasonable opportunity to intervene. And because the alleged excessive force was limited to this one act, there was no ongoing ability to intervene. Under these facts, a jury could not find that Stange is liable for failing to intervene. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1330–31 (11th Cir. 2008) (concluding that officer was not liable for separate officer's excessive force because he could not have anticipated or stopped officer's single punch to plaintiff's stomach); *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988) (concluding that non-intervening officer had no opportunity to prevent three punches in quick succession to plaintiff, but could be liable for later inaction while plaintiff was dragged across the floor).

Gonzalez's summary judgment motion, on the other hand, falls on the other side of the line. Recall that our job when assessing a summary judgment motion is not to weigh evidence, make credibility determinations, resolve factual disputes and swearing contests, or decide which inferences to draw from the facts. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010); *Payne*, 337 F.3d at 770.

Sometimes the heftiness of the evidence on one side, or the credulity of a particular litigant makes our task of suspending factual and credibility determinations difficult, but whatever the difficulty, we must stick to the task on summary judgment. *Payne*, 337 F.3d at 771. That is, summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. We must therefore construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true. *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009–10 (7th Cir. 1999).

The district court concluded that Miller lacked sufficient evidence that Gonzalez's blow was intentional. But it is difficult to imagine—short of an admission from Gonzalez—what other evidence Miller could present of Gonzalez's intent. The district court discredits Miller's assertion that Gonzalez could see him when he jumped over the fence, reasoning that Gonzalez had no reason to know where in the "dark, overgrown yard" Miller was hidden. But according to Miller, Gonzalez *could* see him from outside the yard and knew that he was subdued. Miller asserts that the officer was considerably taller than the chain-link fence, the area was illuminated by nearby lighting, and Gonzalez had enough time to see Miller on the ground because Miller was prostrate for ten to twelve seconds before Gonzalez jumped over the fence and struck him. Under this version of events, it is an unremarkable stretch to conclude that Gonzalez may have, as Miller alleges, deliberately dropped his knee with

his body's full weight onto Miller's jaw, even though Miller was no longer resisting arrest.

The district court appears to have been crediting Gonzalez's version of the facts instead. The district court concluded that "Officer Gonzalez was in pursuit on foot and followed the plaintiff and another officer over the fence and into a yard. In doing so, he stumbled and fell and his knee landed on the plaintiff's jaw." (R.62, p.8). But this was Gonzalez's account of events from his affidavit, not Miller's.

A jury could also infer from the exchange immediately thereafter that Gonzalez did indeed intend to injure Miller. Miller exclaimed, "You ain't have to break my jaw!" and Gonzalez replied "I told you not to run." Of course one interpretation is that Gonzalez was merely stating the unremarkable truism that [he] had ordered Miller to halt and he disobeyed. But Miller's alternate interpretation—that Gonzalez was implying that he was retaliating against Miller for his decision to run—is not inherently implausible. *Cf. Richman v. Sheahan*, 512 F.3d 876, 882 (7th Cir. 2008) (noting that bad blood between arresting officers and arrestee could allow jury to infer, "if just barely," that officers were attempting to punish, and not just arrest him). Deciding which inference to draw from the conversation is the task of a fact finder. *Anderson*, 477 U.S. at 255; *Payne*, 337 F.3d at 770. The district court also concluded that it is too implausible that Gonzalez could have aimed for and struck Miller's face in the dark, but the question of implausibility begs the question: According to Miller, when Gonzalez arrived at the enclosed yard, he could see for at least ten seconds that Miller lay motionless on his stomach, at gunpoint, and with

his arms outstretched. Despite Miller's exhibited and observed passivity, Gonzalez jumped the fence and used the weight of his body to strike Miller's jaw. The district court's decision ultimately rests on the proposition that an accidental use of force cannot be excessive under the Fourth Amendment. But whether Gonzalez's use of force was accidental is precisely the disputed question—a question that cannot be resolved on this record given the competing versions of the event. *See Pauley*, 337 F.3d at 770 ("Where the parties present two vastly different stories … it is almost certain that there are genuine issues of material fact in dispute.").

Finally Miller also asserts that the discrepancy between Gonzalez's police report and his affidavit provides further evidence that a jury might use to conclude that Gonzalez was manipulating facts to cover up his intentional use of force. In his police report Gonzalez states that he "jumped the fence slipped on the wet grass and dove to help [police officer] Stange. I then landed on the suspect and heard him yell out Man you landed on my jaw." (R. 52–10, p. 1). In his affidavit he states that he "fell forward off of the fence" and landed on Miller. (R. 49, p. 3). Perhaps, as the defendants point out, this is merely the result of slightly different wording rather than an actual material discrepancy, but such a determination is one for a fact-finding jury.

Having concluded that Miller, if believed, has presented evidence from which a rational jury could determine that Gonzalez deliberately inflicted the blow that broke his jaw, we must also reject Gonzalez's alternative argument that the use of such force was reasonable under the circumstances.

In assessing whether an officer's use of force violates the Fourth Amendment, we ask whether the officer's actions are objectively reasonable in light of the information known at the time of an arrest. *See Phillips v. Cmty Ins. Corp.*, 678 F.3d 513, 519–20 (7th Cir. 2012); *Common v. City of Chicago*, 661 F.3d 940, 943 (7th Cir. 2011); *Marion v. City of Corydon, Indiana*, 559 F.3d 700, 705 (7th Cir. 2009). This question turns on the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). As will be clear from the discussion that follows, Miller's right to be free from the type of force Gonzalez applied was "clearly established," such that Gonzalez is not entitled to qualified immunity. *See Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 725 (7th Cir. 2013); *Sallenger v. Oakes*, 473 F.3d 731, 741 (7th Cir. 2007).

If Miller is believed, Gonzalez saw him subdued at gunpoint, lying motionless and spread-eagled on the ground, and then deliberately brought down his knee on Miller's jaw with enough force to break it. The officers concede that under Miller's version of events (which we must credit at this point) he demonstrated only "passive resistance," that is, lying with his arms outstretched and obeying every order except for the order to move his hands behind his back. *See, e.g., Phillips*, 678 F.3d at 525. (describing a willful refusal to obey a police officer's order as "passive resistance" warranting only a minimal use of force). Under the aforementioned factors elucidated by the Court in *Graham* (suspected crime, threat to officers, and resistance),

the law is clearly established that police officers cannot use "significant" force on suspects who are only passively resisting arrest. *See Abbott*, 705 F.3d at 732 (citing cases dating back to 1995).

This prohibition against significant force against a subdued suspect applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon. *See Jennings v. Jones*, 499 F.3d 2, 11, 16–18 (1st Cir. 2007) (officer who may have deliberately broken ankle of no-longer-resisting suspect was not entitled to qualified immunity even though suspect had previously been actively resisting arrest, police could not see suspect's hands as they were trapped under his body, and police reasonably believed the suspect had weapon); *Smith v. Mattox*, 127 F.3d 1416, 1419–20 (11th Cir. 1997) (officer who intentionally broke suspect's arm during handcuffing, after suspect submitted to an order to lie on the ground was not entitled to qualified immunity even though the suspect had threatened officer's safety, and had resisted arrest by running away); *see also Cyrus v. Town of Mukwonago, Wisconsin*, 624 F.3d 856, 863 (7th Cir. 2010) (force that is reasonable while a suspect poses a threat may no longer be reasonable as the threat decreases); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) (same).

By Miller's account he was visible to Gonzalez and had been motionless for upwards of ten seconds, at gunpoint, when Gonzalez kneed him in the jaw. If true, this situation is distinguishable from the situation in *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009), upon which Gonzalez relies. In *Johnson*, a shooting suspect fled from police until he was

cornered in a residential yard. *Id.* at 659. Literally moments after the suspect turned and offered to surrender, he was bitten by the pursuing officer's dog and the officer struck him several times until he was handcuffed. *Id.* at 659–60. In affirming the district court's grant of summary judgment on Johnson's excessive-force claim, we ruled that, while officers may not continue to use force against a subdued suspect, Johnson was not yet known to be subdued when his pursuers applied force. *Id.* at 660. The critical fact in *Johnson* was that the officer "had no idea how Johnson was going to behave once he was cornered." *Id.* at 660. Unlike the arresting officer in *Johnson*, by Miller's account, Gonzalez could see that he was prone and subdued at gunpoint. Given this, it would not be objectively reasonable to break Miller's jaw to effectuate arrest (or to protect the officers), notwithstanding his previous attempt to flee. And as the cases cited above demonstrate, this was clearly established at the time of Miller's arrest.

As for Miller's Rule 60(b) motion, Miller argued that the newly discovered evidence that Miller sought to introduce through the motion would change the outcome on summary judgment because it precluded the district court's finding that Gonzalez acted reasonably. Because we are vacating and remanding the grant of summary judgment for Gonzalez, Miller's Rule 60(b) motion is no longer at issue.

For all of these reasons, we VACATE the grant of summary judgment in favor of Gonzalez and remand for further proceedings consistent with this opinion. In all other respects, the judgment is AFFIRMED.

CUDAHY, *Circuit Judge*, dissenting in part. I agree that the judgment for Officer Stange must be affirmed. But, I am also convinced that there is insufficient evidence supporting Mr. Miller's claim that somehow Officer Gonzalez jumped over the fence in an obscure area and deliberately broke Mr. Miller's jaw while he was lying on his stomach. The evidence Mr. Miller has presented simply does not create a plausible story, even viewing the skimpy evidence in Miller's favor as we must on summary judgment review. Accordingly, I would affirm the judgment for Officer Gonzalez as well.