In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-1255

MITCHELL ALICEA,

*Plaintiff-Appellant,*

*v.*

AUBREY THOMAS, ALEJANDRO ALVAREZ
and the CITY OF HAMMOND,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:11-cv-445 — **Theresa L. Springmann**, *Judge.*

ARGUED SEPTEMBER 11, 2015 — DECIDED MARCH 1, 2016

Before BAUER, WILLIAMS, and HAMILTON, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* This appeal arises out of serious injuries suffered by Mitchell Alicea during the course of an arrest by the Hammond Police. Alicea sued Sergeant Aubrey Thomas and Officer Alejandro Alvarez under 42 U.S.C. § 1983 for violating the Fourth Amendment by using excessive and unreasonable force to arrest him. The district court granted

the defendants' motions for summary judgment, finding that Thomas and Alvarez did not use excessive force against Alicea, and that they were entitled to qualified immunity. Because we find that the facts taken in the light most favorable to Alicea create a material dispute as to whether each officer's actions violated clearly established law, we reverse the district court's grant of summary judgment.

## I. BACKGROUND

On March 29, 2011, Mitchell Alicea burglarized a residence on the 4200 block of Towle Avenue in Hammond, Indiana. While inside the residence, Alicea saw a police vehicle. He fled the home and ran north on Towle Avenue, cutting through an alley and into the backyard of another house. Alicea then vaulted into an empty, five-foot deep, above-ground pool in the backyard, where he hid by sitting inside the pool.

### A. Finding Alicea

That same day, Sergeant Aubrey Thomas was on canine duty for the Hammond Police Department when he received a radio dispatch alerting him of a potential burglary. With his seventy-two pound police dog, Leo, he drove to the location provided in the radio dispatch, and learned on the way that the suspect may have fled the crime scene. He turned on his emergency lights and drove to the 4200 block of Cameron Street, where the suspect was last seen. Sergeant Joe Grisafi, his supervisor, was there when he arrived.

Thomas then let Leo out of the squad car on a thirty-foot leash and attached a tracking harness to him. The tracking harness alerted Leo that he was to start searching for a suspect. Thomas ordered Leo to the ground and announced his presence twice, alerting anyone in the general area that the

Hammond Police canine unit was present and a dog would be tracking the area. After Leo tracked the garage and backyard, he began barking by the pool where Alicea was hiding.

### B. Thomas's Use of Force

Thomas's version of events is as follows: he approached the pool with his weapon drawn, and Alicea was inside the pool standing across from him, with his hands in his sweatshirt, staring straight ahead. Alicea did not respond to repeated requests to show Thomas his hands, and kept them concealed. Thomas again asked him to show his hands as he commanded Leo, with his leash still on, to get inside the pool. Thomas then assisted Leo into the pool. He commanded Leo to lie down, and after making a final request that Alicea show his hands, he ordered Leo to bite and hold Alicea so he could safely enter the pool to pat down and arrest Alicea.

Alicea recounts the confrontation quite differently. He says after Leo discovered him, Leo started barking as Thomas appeared and asked Alicea to see his hands. Alicea recalls immediately complying by standing and raising his hands, palms out, at which point Thomas yelled, "You like to rob houses, you f***ing punk?" Thomas then threw Leo into the pool and commanded him to attack Alicea. Leo attacked Alicea for several minutes, latching onto his right arm with his teeth as Alicea struggled to break free from his grip. Leo refused to obey Thomas's order to stop biting Alicea, and it took several minutes for Thomas to remove Leo from Alicea's arm. Alicea was bleeding and screaming in pain from the bites.

### C. Alvarez's Use of Force

Officer Alejandro Alvarez was providing back-up to another officer when he received a radio call that there was a

reported burglary. Alvarez headed to Towle Avenue, where he met Grisafi and Officer Fletcher, who was also with the Hammond Police. After learning Alicea had been seen fleeing through yards north of the burglary scene, the three drove in that direction. Upon arriving at Cameron Street, Alvarez set a perimeter around the area with Fletcher and Grisafi. He received radio notification that Thomas had found the suspect and had deployed his dog in the backyard. Alvarez went to the backyard, where he saw Alicea standing in the pool, and Thomas and Grisafi outside of the pool with Leo. Alicea was bleeding, looked in pain, and was screaming that a dog had bitten him and he needed medical help.

Here again, the parties' stories diverge. Alvarez says that he asked Alicea to get out of the pool, and when Alicea refused twice, Alvarez "helped him" by grabbing him between the shoulders and back and pulling him up and out of the pool. He then told Alicea he needed to pat him down for weapons and asked him to put his hands on the pool and to spread his legs. According to Alvarez, Alicea refused to cooperate, demanding medical attention instead. Finally, Alvarez pushed Alicea to his knees and cuffed his hands behind his back, while Alicea struggled to stand up. Alvarez then pushed Alicea to his stomach, where he held him until the paramedics arrived. During this time, Grisafi and Thomas provided Alvarez with cover. At some point during the arrest, Alicea told Alvarez he needed medical attention, that he was on cocaine, and that he felt like he was going to have a heart attack. Alvarez also testified that Alicea struggled to get up onto his knees from his stomach as Alvarez patted him down to search for weapons. Alvarez maintains that he never kicked, punched, or stomped Alicea during this time period.

Alicea, on the other hand, recalls Thomas inside the pool when Alvarez arrived, trying to extract his arm from Leo's teeth by punching Leo. When Thomas finally succeeded in removing Leo from Alicea, Alicea recalls Alvarez grabbing Alicea by the collar, pulling him over the pool, and dragging him onto the ground outside the pool. Alicea landed on his face, and Alvarez pressed his knee into Alicea's back, punched his backside and ribs, and kicked and stomped on his head. Alicea was then taken to the squad car, where he was handcuffed. At the car, it was determined that he needed immediate medical attention and someone called an ambulance. Alicea admits he may have told both police and hospital personnel that he had used cocaine in order to explain why he started running and to gain admission into the hospital's cardiac ward, where he believed he would receive better treatment. However, Alicea says he did not use cocaine on the day of the arrest.

Due to Officer Alvarez's stomping, kicking, and punching, Alicea says he suffered lumps to the back of his head, bruising on his ribs and back, and difficulty breathing after the arrest. From Leo's attack, he suffered ripped tendons and muscles, which required surgery and caused permanent muscle damage, pain, numbness, and scarring.

### D. District Court Proceedings

Alicea brought federal and state law claims against the City of Hammond, Thomas and Alvarez under 42 U.S.C. § 1983 and Indiana Code § 34-13-4-1, which governs indemnification of government employees for civil rights violations. The defendants filed for summary judgment, arguing that: (1) Alicea's indemnification claims against Hammond were not

ripe for adjudication; (2) Sergeant Thomas's decision to deploy Leo was objectively reasonable; (3) Alvarez's use of force against Alicea was objectively reasonable; and (4) the defendants were entitled to qualified immunity. The district court granted summary judgment in favor of the defendants on all of Alicea's claims, and also granted the defendants qualified immunity. Alicea filed a motion for reconsideration, which the court denied. Alicea now appeals, seeking reversal of summary judgment on his § 1983 claims.

## II. ANALYSIS

On appeal, Alicea argues that the district court erred by granting Thomas's and Alvarez's motions for summary judgment as to his § 1983 claims. He also argues that the district court erred in granting the defendants qualified immunity. We will discuss each issue in turn. We review the district court's decision granting summary judgment de novo and construe all facts in favor of Alicea. *See Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

### A. Summary Judgment Inappropriate for Excessive Force Claims

#### 1. Sergeant Thomas

The district court found that all the facts drawn in Alicea's favor did not establish that Sergeant Thomas used excessive force when he gave Leo the command to bite and hold Alicea. The district court pointed to the fact that Alicea was a felony burglary suspect in active flight, and Thomas was dealing with an unknown threat. So, it held that Thomas's use of canine force was reasonable in light of the knowledge he possessed at the time he made the attack command.

This type of § 1983 excessive force claim originates from the Fourth Amendment's protection against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989). An officer's use of force is analyzed under the Fourth Amendment's objective reasonableness standard, and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. A court examines the defendant's use of force in light of the following factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.*

We have held that force is only reasonable when it is proportional to the threat posed. If an officer's threat perception changes, so too should her force calculus. *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (finding that while first taser shot is justified due to uncertainty of threat, once suspect is on the ground and unarmed, subsequent taser shots are unreasonable). In *Miller v. Gonzalez*, we held that significant force is unreasonable after a suspect has stopped resisting or evading arrest. 761 F.3d at 829 (7th Cir. 2014). In *Miller*, the suspect was in flight and then became trapped in an enclosed area after jumping a fence. *Id.* at 824-25. Upon reaching him, the officer ordered him to lie on the ground, spread eagle, which he did. *Id*. at 825. The officer then jumped over the fence and landed on the plaintiff, breaking his jaw. *Id*. at 825. We held that summary judgment was inappropriate because it was unreasonable for the officer to intentionally use force after the suspect was subdued. *Id.* at 830. Similarly, in *Holmes v. Hoffman Estates*, we held that a jury could find it excessive to knock the plaintiff's head against a police vehicle if,

as he contended, he was compliant with the officer's orders throughout the arrest. 511 F.3d 673, 686 (7th Cir. 2007).

At the same time, we have concluded that under certain circumstances, an officer is not required to take an apparent surrender at face value. *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009). In *Johnson*, we affirmed summary judgment where a police officer, in hot pursuit of a fleeing suspect, released his dog to assist the chase. Not more than one second from the suspect throwing his hands up and saying "I give up," the dog bit and held him as the officer caught up to make the arrest. The officer then struck the suspect to subdue him, because he interpreted the suspect's struggle with the dog as resistance. We found that the officer's split second decision to use force was reasonable to apprehend a suspect in active flight because "the police are entitled to err on the side of caution when faced with an uncertain or threatening situation." *Id*. at 659.

Here, defendants argue that even taking Alicea's version of events as true, Alicea's prior flight cast doubt on the genuineness of his surrender. Despite the fact that Alicea asserts he immediately complied with Thomas's orders to put his hands in the air, they argue that Alicea still posed a threat because it was possible he was concealing weapons or would attempt to vault out of the pool the way that he vaulted in. Thomas argues that given the uncertain circumstances, deploying Leo was the safest way to control both the flight and safety risks he perceived as events unfolded, and so he acted reasonably in giving Leo the command to bite and hold Alicea.

We disagree. With respect to Thomas's consideration of Alicea's prior flight, "[the] prohibition against significant force against a subdued suspect applies notwithstanding a

suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon." *Miller*, 761 F.3d at 829. Unlike the plaintiff in *Johnson*, Alicea was not in active flight at the time he was discovered. Rather, under his version of the facts, which we accept as true for summary judgment purposes, he was standing still, arms raised, inside of an empty above-ground pool, surrounded by five foot walls. Also, the events took place in broad daylight, so limited visibility did not impede Thomas's efforts to carry out the arrest when Leo signaled that he had discovered Alicea in the pool. *Cf. Miller v. Clark Cnty.*, 340 F.3d 959, 965 (9th Cir. 2003) (finding use of canine force reasonable where plaintiff refused to pull over and ultimately fled by foot into dark, unfamiliar terrain). Significantly, Thomas had his gun drawn and trained on Alicea the entire time he was facing the pool and giving Alicea orders. If Alicea attempted flight, he would need to get out of the pool first. The obstacle of vaulting out of the pool would provide Thomas with ample time to discharge his weapon or to command Leo to chase and hold Alicea. Moreover, Alicea gave no indication that he would flee. He immediately complied with Thomas's orders. While surrender is not always genuine, it should not be futile as a means to de-escalate a confrontation with law enforcement. The sole fact a suspect has resisted arrest before cannot justify disregarding his surrender in deciding whether and how to use force. *See Miller*, 761 F.3d at 829.

Another fact supports our conclusion that summary judgment was improper. Yelling "you like to rob houses, you f***ing punk?" before commanding Leo to attack casts doubt on Thomas's assertion that he made a split-second safety calculation. Thomas's statement indicates that he had at least

some time to assess the threat that Alicea posed before order-
ing the attack. The district court found the statement to be ir-
relevant because deploying Leo was ultimately reasonable,
given the circumstances. But if one infers from the statement
that rather than making a safety calculation, Thomas was act-
ing out of retaliation, then his decision to deploy Leo was not
reasonable at all. The statement "you like to rob houses, you
f***ing punk" could reflect, as Thomas contends, an "unre-
markable truism" that Alicea enjoyed robbing houses. *See
Miller*, 761 F.3d at 828. However, the statement equally lends
credence to Alicea's argument that deploying Leo was an act
of retaliation instead of a reasonable means of controlling a
perceived threat. Deciding which inference is more believable
is the task of a jury. *Id.*

Applying the *Graham* factors to Alicea's account, we do not
find that Alicea, standing in broad daylight with his hands up
at gunpoint and enclosed by a five-foot pool, posed a suffi-
cient threat to Thomas to justify ordering Leo to attack and
hold him. The district court erred in holding it was reasonable
to command a dog to attack a suspect who had ceased flight,
was effectively trapped, and who immediately complied with
police orders.

### 2. Officer Alvarez

We see even less of a basis to grant summary judgment to
Officer Alvarez, taking all facts in a light most favorable to
Alicea. At the point at which Alvarez first saw Alicea, Alicea's
arm was in the jaws of a seventy-two pound dog. Two other
officers were already at the scene. A reasonable officer would
not think that punching, kicking, and stomping on Alicea was
required to control the situation. It is true that Alicea was
screaming, but there is no dispute that he was crying for help.

The district court found that Alicea did not produce sufficient evidence of the kicking, stomping and punching because there was no medical documentation of injuries related to such conduct. It found that Alicea's affidavit detailing injuries was insufficient to create a factual dispute, because the defendants produced medical records which lacked any mention of head injuries, and also because photographs taken in the ambulance did not reveal any injuries.

The district court engaged in improper weighing of evidence at the summary judgment stage. It also mistakenly inserted an injury requirement into its excessive force analysis. The defendants point to a series of decisions where we held that the use of force that resulted in injuries was constitutional. *See, e.g., Smith v. Ball State*, 295 F.3d 763 (7th Cir. 2002); *Padula v. Leimbach*, 656 F.3d 595, 602–03 (7th Cir. 2011). However, the question before us is not whether it is permissible to inflict injuries on a suspect who is resisting arrest. Rather, the question is whether Alvarez used the degree of force which a reasonable officer would believe was required to subdue the threat.

The defendants direct our attention to cases where officers used force against suspects whom they perceived to be refusing orders. In *Smith v. Ball State*, the plaintiff, suspected of driving while intoxicated, was completely unresponsive, and the defendants forcibly removed him from the driver's seat of his car. 295 F.3d at 766. An officer who arrived to the scene misconstrued the situation as a struggle, and tackled the plaintiff to the ground. *Id* at 767. We found that "a reasonable officer who happened on the scene could reasonably misconstrue Smith's unresponsiveness as resistance requiring the minimal use of force." *Id*. at 771. Similarly, in *Padula v.*

*Leimbach,* the plaintiff was having a hypoglycemic episode
where he both refused to respond to police instructions and
displayed aggressive behavior. 656 F.3d at 598–99. The police
forced the plaintiff into a prone position. *Id.* We found in favor
of the officers, stating that "the Officers faced a fluid situation
… [and] appropriately increased their force in order to keep
the situation under control." *Id*. at 604. In *Dawson v. Brown*, we
found that the defendant officer acted reasonably in tackling
a man to the ground when, on arriving at the scene where the
man's son was being arrested, he reasonably perceived the
man to be interfering with his son's arrest. 803 F.3d 829, 833
(7th Cir. 2015).

In contrast, Officer Alvarez came upon Alicea when he
was already seriously injured. Alicea was agitated, to be sure,
but the source of his agitation was clear: he had just been at-
tacked by a dog, and needed medical attention. Alicea testi-
fied at his deposition that he was already face-down, on the
ground, when Alvarez began to punch, kick and stomp on
him. At this point, however loudly Alicea was screaming, un-
der his version of events, he simply did not present a threat
that justified kicking, stomping, and punching him. "Permit-
ting substantial escalation of force in response to passive non-
compliance would be incompatible with our excessive force
doctrine and would likely bring more injured citizens before
our courts." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 730 (7th
Cir. 2013) (citing *Phillips v. Comty. Ins. Corp*. 678 F.3d 513, 527
(7th Cir. 2012)).

In sum, Alicea's factual account creates a material dispute
as to whether Officer Alvarez used excessive force. Lack of
medical documentation of his injuries, while potentially rele-

vant to Alicea's credibility, is immaterial to the threshold question of whether Officer Alvarez's use of force was reasonable when the facts are viewed and reasonable inferences are drawn in Alicea's favor.

### B. Grant of Qualified Immunity Improper

Alicea further argues that the district court erred in granting qualified immunity to both officers. The doctrine of qualified immunity protects government officials from liability when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). The district court granted qualified immunity because it found that Alicea failed to demonstrate that either defendant deprived him of his constitutional rights. It further rejected the cases that Alicea provided to support his argument that the defendants' actions violated clearly established law.

As explained above, we conclude that the evidence, taken in a light most favorable to Alicea, would permit a reasonable jury to find excessive force in violation of the Fourth Amendment. So we turn to the question of whether Thomas's and Alvarez's actions violated clearly established law.

In determining whether a right is "clearly established," we take care to look at the right in a particularized sense, rather than at a high level of generality. *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011). When available, controlling precedent from either the Supreme Court or our circuit will guide our inquiry. However, a case holding that the exact action in question is unlawful is not necessary. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377–78 (2009). Even where there are notable

factual distinctions, prior cases may give an officer reasonable warning that his conduct is unlawful. *Phillips v. Cmty. Ins. Corp.,* 678 F.3d 513, 528 (citing *Estate of Escobedo v. Bender,* 600 F.3d, 770, 781 (7th Cir. 2010)).

At the time of Alicea's arrest, it was clearly established that an officer may not use excessive force against an individual during an arrest. *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 687 (7th Cir. 2007). It was also clearly established that using a significant level of force on a non-resisting or a passively resisting individual constitutes excessive force. *Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995). Commanding a dog to attack a suspect who is already complying with orders clearly violates the principles set forth in *Holmes* and *Rambo*. Punching, stomping and kicking a suspect who is on the ground and seriously injured similarly violates clearly established law.

There is a material dispute as to whether Alicea was resisting arrest, both at the moment that Thomas commanded Leo to attack him, and at the moment that Alvarez arrived at the scene of the arrest and removed Alicea from the pool. There is also a material dispute as to the level of force that Alvarez used, described in detail above. "Because the facts are in hot dispute, the officers cannot seek pretrial refuge behind a claim of qualified immunity." *Dufour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998). It was improper to grant qualified immunity to Thomas and Alvarez prior to a jury determining whether Alicea was, as he contends, fully complying with orders before the defendants used force to arrest him.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the grant of summary judgment and REMAND for proceedings consistent with this opinion.