In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 24-1252

RYAN STEINHOFF,

*Plaintiff-Appellant,*

*v.*

MATTHEW MALOVRH, *et al.,*

*Defendants-Appellees.*

———————

Appeal from the United States District Court for
the Western District of Wisconsin.
No. 3:21-cv-00664-wmc — **William M. Conley,** *Judge.*

———————

ARGUED FEBRUARY 26, 2026 — DECIDED MARCH 24, 2026

———————

Before EASTERBROOK, SCUDDER, and ST. EVE, *Circuit Judges*.

SCUDDER, *Circuit Judge*. On October 28, 2018, law enforcement officers executed a search warrant for methamphetamine on a rural property in Wisconsin. They believed that Ryan Steinhoff, an alleged drug dealer with a history of violent crime, lived on the property. When officers found Steinhoff in a camper during the search, he at first appeared cooperative and exited as instructed. But an officer quickly tackled him to the ground and, somewhere in the scuffle, the barrel of

another officer's M16 rifle hit Steinhoff's head, leaving a gash requiring stitches. The record contains body-camera footage of the incident, but we cannot tell whether the blow to the head was intentional, as Steinhoff would have it, or accidental, as the second officer insists.

In the end, we affirm the district court's award of qualified immunity to the first officer but reverse as to the second because disputed facts require Steinhoff's Fourth Amendment excessive force claim to go to a jury.

## I

### A

In 2018, the Taylor County Sheriff's Department investigated a methamphetamine trafficking operation involving Ryan Steinhoff. On October 27, Detective Cody Kowalczyk applied for a warrant to search a property in Medford, Wisconsin, where he believed Steinhoff and others involved in the operation were living. The warrant application explained that law enforcement had arranged a controlled purchase of methamphetamine from Steinhoff earlier that month, that Steinhoff had a history of violent crime, and that his mental health was under evaluation in a pending misdemeanor case.

A Taylor County judge approved the application and authorized a search for evidence of methamphetamine possession in violation of Wisconsin law. The property in question contained a two-story main residence and multiple small outbuildings. Due to the property's size and the number of individuals believed to be present, law enforcement assembled a SWAT team of officers from Taylor County and neighboring Clark County to conduct the search. The team included Detective Kowalczyk, Clark County Drug Investigator Matthew

Malovrh, Clark County Patrol Captain Charles Ramberg, and Clark County Deputy Joshua Niemi.

The SWAT team assembled early on the morning of October 28, 2018. Detective Kowalczyk and another officer briefed everyone on the investigation, the plan for executing the warrant, and the criminal histories of individuals they might encounter during the search, including Steinhoff. They informed the team that Steinhoff had prior convictions, including for robbery with use of force, aggravated battery, and resisting an officer. The briefing also cautioned that Steinhoff and others might try to flee.

Just before 6:00 a.m. and under the cover of darkness, the team initiated the search. After clearing the main residence with Taylor County law enforcement, Detective Kowalczyk went to assist the Clark County team at the southern end of the property. In that area, Captain Ramberg saw three campers and noticed a light on in one. Law enforcement approached it and announced their presence. Upon opening the door, Captain Ramberg saw a blanket hanging in the doorway, which Steinhoff was standing behind. An officer pulled the blanket down, and someone ordered Steinhoff to show his hands. The officers could see that his hands were empty, and nobody observed any visible sign of a weapon.

The rest of Steinhoff's encounter with law enforcement comes from Deputy Niemi's body-camera. But the footage is dark, grainy, at times obscured, and does not clearly depict the takedown of Steinhoff. And it all happened in a matter of seconds.

The video shows that as Deputy Niemi approached the camper, Detective Kowalczyk, Investigator Malovrh, and

Captain Ramberg surrounded the doorway. The latter two carried rifles. The officers ordered Steinhoff to come out and show his hands. Steinhoff exited the camper as an officer directed him to "get out," and "turn around." Once down the camper stairs, Steinhoff began to turn around and raise his hands. He then stopped with his back to the officers, partially facing an open field.

But from there the video is too dark, and the takedown too swift, to know exactly what happened next. Steinhoff claims he stopped and stood still with his hands up, while Detective Kowalczyk and Investigator Malovrh contend that he began walking away toward the field, as if to flee. Regardless, the footage shows that Detective Kowalczyk tackled Steinhoff from behind about three seconds after he exited the camper. Then Investigator Malovrh helped restrain him on the ground, including by placing his knee on Steinhoff while Detective Kowalczyk handcuffed him.

At some point during the encounter, a rifle barrel struck Steinhoff's ear, causing a cut that required at least nine stitches. Steinhoff testified that he saw the rifle barrel swing toward the side of his head and hit him while he was still standing. The video also contains an audible "clink" as Detective Kowalczyk begins the takedown, with Steinhoff maintaining that the sound is that of the rifle hitting him in the head.

Based on these events, Steinhoff believes that Investigator Malovrh intentionally struck him in the head with his rifle just as the takedown began. Investigator Malovrh denies any involvement in the initial tackle and believes that if his rifle hit Steinhoff at all, it was by accident while assisting Detective Kowalczyk after Steinhoff fell.

B

Steinhoff invoked 42 U.S.C. § 1983 and sued Detective Kowalczyk, Investigator Malovrh, and Captain Ramberg for using excessive force in violation of the Fourth Amendment during the takedown, when the rifle struck him, and when Investigator Malovrh placed his knee on his neck, head, or upper back while he was handcuffed. He added Clark and Taylor Counties as defendants for indemnification purposes. The officer defendants moved for summary judgment and claimed qualified immunity. Steinhoff moved for partial summary judgment against Detective Kowalczyk.

The district court entered summary judgment for Captain Ramberg because Steinhoff conceded that the officer did not use excessive force against him. It also denied Investigator Malovrh summary judgment on the limited aspect of the claim that he used excessive force when he kneeled on Steinhoff. That claim went to trial where a jury found for Investigator Malovrh. Neither of those claims are on appeal.

Moving to Detective Kowalczyk, the district court observed that, even assuming Steinhoff did not try to flee, a jury would "almost certainly" find that "an objective officer's use of force in taking Steinhoff to the ground and subdu[ing] him was not unreasonable" given the "murky dynamics" of an early morning drug raid. The district court further concluded that Detective Kowalczyk was entitled to qualified immunity because Steinhoff did not identify clearly established law "prohibiting the use of a takedown under the dynamic circumstances presented."

Finally, the district court concluded that no reasonable jury could find that Investigator Malovrh intentionally hit

Steinhoff with his rifle. Even if he accidentally hit Steinhoff, the district court determined that this unintentional use of force would not have been excessive and therefore granted summary judgment without reaching qualified immunity.

Steinhoff now asks us to reverse the district court's entry of summary judgment for Detective Kowalczyk and Investigator Malovrh related to the tackle and rifle strike and, separately, the denial of his corresponding motion against Detective Kowalczyk.

## II

### A

We review a district court's award of summary judgment on qualified immunity grounds by examining the facts anew and drawing all reasonable inferences in favor of the non-moving party, here Steinhoff. See *Neita v. City of Chicago*, 148 F.4th 916, 930 (7th Cir. 2025).

When an officer invokes qualified immunity, the burden falls to the plaintiff to show not only that the officer's conduct violated a federal right, but also that the right was clearly established at the time of the alleged violation. See *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). We may address these prongs in any order. See *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Fourth Amendment governs the use of force during the execution of a search warrant. See *Muehler v. Mena*, 544 U.S. 93, 98–99 (2005). "[O]fficers executing a search warrant for contraband have the authority" to detain persons on the premises during the search, *id.* at 98, to further certain law enforcement interests: "officer safety, facilitating the completion of the search, and preventing flight," *Bailey v. United States*,

568 U.S. 186, 194 (2013). Inherent in the power to detain is the "authority to use reasonable force to effectuate the detention." *Muehler*, 544 U.S. at 98–99.

As with other Fourth Amendment seizures, we ask whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). We consider, for instance, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting" or "attempting to evade" detention "by flight." *Kisela v. Hughes*, 584 U.S. 100, 103 (2018) (per curiam) (cleaned up). The reasonableness inquiry also accounts for "the fact that police officers are often forced to make split-second judgments" about the proper use of force in dynamic situations. *Id.* (cleaned up). This last observation is front and center of our analysis here because "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Michigan v. Summers*, 452 U.S. 692, 702 (1981).

As for the second prong of the qualified immunity inquiry, a constitutional right is clearly established if existing precedent "place[s] the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021). Put another way, the law in place at the time of the challenged conduct must demonstrate that "a reasonable official would understand that what he is doing violates that right." *Smith v. Finkley*, 10 F.4th 725, 742 (7th Cir. 2021) (cleaned up).

Time and again the Supreme Court has emphasized the necessity of defining clearly established law with specificity. See, *e.g.*, *Zorn v. Linton*, 607 U.S. ----, 2026 WL 795469, at *2

(Mar. 23, 2026); *Wesby*, 583 U.S. at 63–64. With Fourth Amendment excessive force claims, the Court has further underscored that precedent at the time of the challenged conduct must "'squarely govern[]' the specific facts at issue" to create clearly established law because "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case.'" *Kisela*, 584 U.S. at 104–05 (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (per curiam)).

B

We begin with the claim against Detective Kowalczyk.

The video evidence does not definitively show whether, upon exiting the camper, Steinhoff tried to flee. So we assume for the purpose of Detective Kowalczyk's summary judgment motion that Steinhoff complied with the SWAT team's orders to turn around and, presumably, to stay put. But even so, we cannot conclude that Detective Kowalczyk violated clearly established law when he tackled Steinhoff.

What stands out most are the circumstances in which the takedown occurred—a search for evidence of drug possession involving individuals with a history of violence and risk of flight. This is precisely the kind of dangerous situation that requires officers to make the split-second judgments that often justify the protection of qualified immunity. See *Summers*, 452 U.S. at 702; see also *Muehler*, 544 U.S. at 99 (reiterating that "the risk of harm to officers and occupants is minimized 'if the officers routinely exercise unquestioned command of the situation'" (quoting *Summers*, 452 U.S. at 703)).

The SWAT team knew that it would need to secure multiple people who might try to flee, resist, or destroy evidence, and that there might be firearms present. See *Muehler*, 452 U.S.

at 108 (Stevens, J., concurring) (observing that executing a search warrant in a dangerous context may justify "overwhelming force and surprise in order to secure the premises as promptly as possible"). Swift action was essential. We are not aware of any clearly established law that would have put Detective Kowalczyk on notice that his action in tackling Steinhoff amounted to a Fourth Amendment violation.

Steinhoff disagrees, relying in large part on *Alicea v. Thomas*, 815 F.3d 283 (7th Cir. 2016), and *Miller v. Gonzalez*, 761 F.3d 822 (7th Cir. 2014), for the proposition that an officer cannot use substantial force against a non-resisting suspect. *Alicea* involved the pursuit of a felony-burglary suspect who fled from law enforcement and ended up in an empty above-ground pool in a backyard. See 815 F.3d at 286, 288. We concluded that an officer used excessive force when he assisted his dog into the pool and commanded him to bite and hold the suspect after the person had already complied with the officer's command (at gunpoint) to raise his hands. See *id.* at 286, 289–90. We emphasized that it was broad daylight and that the suspect would have had to vault out of the pool to escape, giving the officer plenty of time to apprehend him. See *id.* at 289–90.

*Miller* presents a similar fact pattern. Officers investigating a stabbing came upon a man who admitted that he was on probation for burglary and disorderly conduct. See 761 F.3d at 824. The man, now a suspect, fled, eventually hopping a fence into an enclosed yard. See *id.* An officer held him at gunpoint and ordered him to the ground. See *id.* at 825. After the suspect was on his stomach for about 10 seconds, the officer jumped over the fence and landed on him, breaking his jaw. See *id.* at 825, 828. We held that this use of force was excessive

and not protected by qualified immunity because the suspect was already prone and subdued at gunpoint. See *id.* at 829–30.

Neither *Alicea* nor *Miller* help Steinhoff. Neither concerned the execution of a search warrant for drugs across a large property where officers expected to encounter armed, violent, or flight-ready individuals. They only involved a single suspect. And that suspect was boxed in at a distance from law enforcement, giving the officer time to reassess the threat level and calibrate his use of force. In short, the officers in *Alicea* and *Miller* were not under pressure to make rapid decisions to control a potentially dangerous situation. This case is the opposite in every way.

Steinhoff cites a host of other cases, but they are similarly devoid of high-stakes drug raids often requiring quick police action. And most involve uses of force on people who were both compliant and suspected of non-violent crimes, or the use of gratuitous force on someone who was already subdued.

In the end, then, we affirm the district court's award of qualified immunity to Detective Kowalczyk and, accordingly, its denial of Steinhoff's cross-motion.

C

We see the analysis for Investigator Malovrh differently. To our eye, Steinhoff's primary contention is that Investigator Malovrh intentionally hit him in the head with his rifle as Detective Kowalczyk tackled him. But describing an argument is different from knowing what happened. And that is the circumstance we find ourselves in here.

Steinhoff did not claim to see who hit him. Nor does the body-camera footage show what transpired during the takedown. And while Investigator Malovrh claims he joined in once Steinhoff was on the ground, Detective Kowalczyk testified that Investigator Malovrh assisted from the start. We cannot reach any conclusions on qualified immunity without knowing the material facts. But there is enough circumstantial evidence of an intentional use of excessive force to send this question to trial.

A jury could find that Investigator Malovrh's rifle hit Steinhoff while he was standing, which is inconsistent with Investigator Malovrh's insistence that he only jumped into the fray once Steinhoff was on the ground. Steinhoff testified that he saw a rifle swing and hit him while he was still upright. The audible "clink" in the video could corroborate that the rifle made contact while he was standing. More, Captain Ramberg was the only other officer nearby with a rifle, yet all agree that he took no part in the takedown. That Investigator Malovrh's rifle allegedly hit Steinhoff while he was standing, and with enough force to inflict a deep cut, further indicates that the blow may have been intentional.

Lesser factors also inform our judgment. After the takedown for instance, Steinhoff complained about what happened, saying, "my ear's split with that gun you hit me with." Somebody responded, "[w]ell, don't take off—try to take off when we're giving you orders." But it is unclear which officer made the comment. A jury could find that the officer, having seen the incident, implicitly acknowledged that Investigator Malovrh hit Steinhoff intentionally. See *Miller*, 761 F.3d at 828 (holding that a jury could conclude that an officer who

jumped onto a suspect intended to injure them when he replied to the suspect's complaint, "I told you not to run").

Viewing the facts in the light most favorable to Steinhoff, we cannot conclude that Investigator Malovrh is entitled to qualified immunity at summary judgment. A blow to the head with a rifle could qualify as deadly use of force because it may pose a "substantial risk of serious bodily harm." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016); see *Sallenger v. Oakes*, 473 F.3d 731, 740 (7th Cir. 2007) (holding that blows with fists and a flashlight to the back of a head may be deadly force). And an officer cannot use deadly force against a non-resisting suspect. See *Gant v. Hartman*, 924 F.3d 445, 451 (7th Cir. 2019) (citing pre-2018 cases). Again, though, we do not know what happened. Investigator Malovrh may reinvoke qualified immunity at trial as the facts develop, including through special interrogatories. See *Smith*, 10 F.4th at 749–50; *Strand v. Minchuk*, 910 F.3d 909, 918–19 (7th Cir. 2018).

We recognize that Steinhoff has an alternative line of argument—that if Investigator Malovrh unintentionally hit him with his rifle during an intentional and, in Steinhoff's view, excessive tackle, Investigator Malovrh is liable for a Fourth Amendment violation. We do not pass upon this theory except to observe that its viability can be also sorted out with additional fact-finding at trial.

\* \* \*

In the final analysis, we AFFIRM the district court's entry of qualified immunity to Detective Kowalczyk and the corresponding denial of partial summary judgment for Steinhoff. But we REVERSE the district court's entry of summary

judgment for Investigator Malovrh. We REMAND the case for further proceedings consistent with this opinion.